STATE of Alaska, DEPARTMENT OF REVENUE, CHILD SUPPORT ENFORCEMENT DIVISION, Appellant,

v.

Robert WETHERELT, Appellee.

No. S–7464.

Supreme Court of Alaska.

Jan. 24, 1997.

Diane L. Wendlandt, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Kenneth C. Kirk, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

RABINOWITZ, Justice.

## I. *INTRODUCTION*

At issue in this appeal are arrearage payments made by Robert Wetherelt to the State of Alaska, Department of Revenue, Child Support Enforcement Division (CSED) for the support of a child who was ultimately proven not to be his. Wetherelt was named as father on Roberta Wetherelt's birth certificate, thus establishing a legal presumption of paternity. CSED proceeded to collect reimbursement for child support based on the premise that Wetherelt was legally responsible for Roberta Wetherelt. Though Wetherelt asserted to CSED in April 1989 that he could not be Roberta's father, he did not conclusively prove this by blood test until March 1994. He thereafter brought an action to recover the payments he made to CSED.

The superior court held that a 1983 dissolution decree which failed to mention Roberta disestablished Robert Wetherelt's paternity as a matter of law and that CSED should not have collected support from him after this date. The superior court further determined that CSED was unjustly enriched by Wetherelt's payments and ordered the State to reimburse Wetherelt the amount retained by CSED. The State now brings this appeal.

## II. FACTS AND PROCEEDINGS

Robert Wetherelt and Mary Lake were married in 1972. On December 14, 1974, Lake gave birth to a daughter, Roberta Wetherelt. On the birth certificate, Wetherelt was named as father.[1] Wetherelt and Lake separated soon after and in October 1977, Lake applied for Aid to Families with Dependent Children (AFDC) on behalf of Roberta. On the application for assistance, Lake stated that she was separated from Wetherelt and identified him as Roberta's father. As required by statute, Lake assigned her rights to child support payments to the State for as long as she received AFDC benefits.

In 1983, Lake and Wetherelt filed a joint Petition for Dissolution of Marriage. Where the petition asked, "Are there minor children born of the marriage or adopted?" the parties marked "no." The petition nowhere mentions Roberta.

On August 18, 1983, a dissolution hearing was held before a master. The hearing was brief, and Wetherelt did not appear. Lake testified that there were no children of the marriage. No evidence of paternity was admitted, nor did the superior court make any findings or conclusions related to Roberta. The superior court proceeded to enter a decree of dissolution which incorporated the parties' agreements as reflected in the petition. With respect to child custody and support, the superior court entered "N/A" on the standard form decree.

Since the State had been supporting Roberta through AFDC, CSED served Wetherelt with an administrative support order known as a Notice and Finding of Financial Responsibility (NFFR) in April 1989. Two forms provided by Lake to CSED indicated that Wetherelt was Roberta's father. The NFFR stated that if the recipient had any objections, he had the right to request a conference at which the issue of liability would be decided; otherwise, the NFFR would be legal and binding.

In response, Wetherelt requested an informal telephonic conference, stating: "Roberta is not my child. Mary and I had separated and she had a baby by someone else. I had visectomy [sic] over 22 years ago." Based on this claim, CSED investigated the matter and obtained copies of the dissolution papers and Roberta's birth certificate, indicating that the parties were indeed married when Roberta was born. CSED concluded that a legal parent-child relationship between Wetherelt and Roberta was created at birth, and that the dissolution decree was not sufficient to disestablish paternity. In a letter addressed to Wetherelt dated June 29, 1989, CSED stated:

> [T]he decree of dissolution of marriage stating that there are no children of the marriage does not constitute a court order sufficient to override the presumption of paternity as the court might not have been aware that there were any children and there was an issue of paternity or non-paternity and just accepted that there were no children. The Attorney General's position is that CSED is entitled to rely upon the presumption of paternity for the following reasons: (1) The parties were married at the time of the birth of the child. (2) You are listed as the father on the birth certificate. (3) Mary Wetherelt named you as the father on 2 AFDC applications. Therefore CSED will pursue the proceedings for the establishment of a child support order and you will have to pursue your own legal action to determine non-paternity.

CSED began collecting support from Wetherelt in January 1990. In April 1992, Wetherelt wrote to CSED requesting that the sum of his wages garnished monthly in order to pay his support obligation be decreased. Wetherelt stated in the letter that "there is a dispute about the paternity of the child I am supporting and at this point I am trying to resolve it." He further claimed that the financial burdens being inflicted by CSED made any such resolution impossible.

---

1. AS 18.50.160(d) provides:
 If the mother was married at the time of conception or birth, the name of the husband shall be entered on the certificate as the father of the child unless paternity has been determined otherwise by a court of competent jurisdiction, in which case the name of the father, if determined by the court, shall be entered.

Attached to the letter was an affidavit asserting that Wetherelt had an "irreversible vasectomy" performed on March 16, 1964, and that he had fathered no children since that time. Wetherelt also enclosed medical records indicating that the vasectomy actually occurred and that his sperm count was zero as of June 1990.

In response, CSED sent Wetherelt a letter dated April 9, 1992, agreeing to modify its order withholding monthly wages. With respect to the issue of paternity, CSED stated:

> As you are aware, you will have to obtain an attorney and prove paternity on your own. Because you and Mary were married at the time the child was conceived, the State of Alaska considers you to be the father of said child. Meanwhile, while you are working towards settling the paternity issue, your support order could be reviewed for modification if you would complete and return the paperwork that was mailed in November 1991 . . . .

Wetherelt wrote to CSED again in April 1992, acknowledging receipt of notice that his garnishment had been lowered, and "asking for more help" in forgiving the interest on his arrears. He again asserted that he was not the father of Roberta, and stated that he was "seeking legal assistance to prove" this. Wetherelt requested an informal hearing with CSED and a blood test to prove non-paternity.

CSED responded on May 16, 1992, informing Wetherelt that interest would not accrue on his debt, but that CSED would not assist him in setting up blood testing. The letter stated that because Wetherelt "signed the affidavit of paternity which put [his] name on the child's birth certificate as the father,"[2] he would have to get a judge's order removing his name from the birth certificate before CSED could help set up dates for blood testing.

In January 1993, Wetherelt filed motions to "reaffirm non-paternity" and to enjoin CSED from enforcing child support arrearages against him. The superior court denied these motions on April 22, 1993, but ordered CSED to coordinate blood testing at Wetherelt's expense. The court further specified that withholding of Wetherelt's wages be continued, but that "effective on the date of this Order, CSED shall deposit with the court those funds garnished pending outcome of the paternity test. In the event that nonpaternity is established accumulated funds shall be returned to Robert Wetherelt."

Subsequent paternity tests excluded Wetherelt as Roberta's father. On August 25, 1994, the superior court entered an order declaring Wetherelt "not to be the father of Roberta Wetherelt" and ordered that CSED return to Wetherelt accumulated support funds pursuant to the court's April 22, 1993 order. CSED returned these funds to Wetherelt.

On March 24, 1994, shortly after receiving the results of the paternity test, Wetherelt filed an action against CSED and Lake seeking a refund of the money collected by CSED prior to April 1993. The parties filed competing summary judgment motions which were denied. Thereafter, at the conclusion of a court trial, the superior court issued oral findings and conclusions, which were later reflected in its written findings of fact and conclusions of law.

The superior court concluded that the Master had effectively determined in the 1983 dissolution proceedings that Roberta was not a child of the Wetherelt's marriage. Thus the superior court held that, given the dissolution decree, CSED should not have proceeded to collect child support from Wetherelt. The court ordered CSED to refund Wetherelt $20,118.69, the amount retained by the State as reimbursement for AFDC payments, and ordered Lake to refund Wetherelt $18,928.53, the amount disbursed by CSED to her as child support.

CSED sought reconsideration, which was denied. After the superior court entered its final judgment, CSED brought this appeal.[3]

---

2. Wetherelt notes that he never signed a paternity acknowledgment. However, his name appears on the birth certificate pursuant to AS 18.50.160(d).

3. In its written findings the superior court found in part:

> The court also finds overall that there were no children of the marriage since the court in

## III. DISCUSSION

### A. Did the Superior Court's 1983 Dissolution Decree Terminate Wetherelt's Duty of Support? [4]

 The parties do not dispute that prior to 1983 Wetherelt owed Roberta a duty of support. The issue is when the presumption of paternity that results from being married to a woman at the time she gives birth was legally rebutted. In order for such a presumption to be rebutted, a court must find clear and convincing evidence that the child is not of the marriage. *Smith v. Smith*, 845 P.2d 1090, 1092 (Alaska 1993). The superior court concluded that the 1983 dissolution decree specifically adopting Mary and Robert Wetherelt's representations that there were no children of the marriage effectively terminated Wetherelt's duty of support. The State contends that this conclusion is incorrect as a matter of law, asserting "a court cannot disestablish paternity if it does not know that the child exists."

The State claims that the 1983 dissolution decree fails to meet the clear and convincing evidence standard for overcoming the legal presumption of paternity required under *Smith*. It supports this claim with two basic arguments.

First, the decree on its face makes no findings concerning children or the lack of children. Though the superior court found that the dissolution order "was that there were no children of the marriage," the State points out that the order merely incorporated the agreements reflected in the petition for dissolution. "Because *the parties* (not the court) stated that there were no children of the marriage, the court simply typed in 'N/A' in the space allowed for Child Custody and Support. Thus, there was no express finding concerning children on the face of the dissolution decree."

The State further contends that even if the court's incorporation of the parties' agreement is interpreted as a finding that there were no children of the marriage,

> there was clearly no evidence offered, whether clear and convincing or otherwise, on the issue of paternity. The reason for this omission was simple: the court did not know Roberta existed. For this very reason, this Court has warned against basing the disestablishment of paternity on a form dissolution decree....
>
> ... *The court in the dissolution action did not even know (and could not have known) that it was terminating Mr. Wetherelt's parental obligations for an unidentified child, via a later superior court judge's decision.* Thus, by its ruling in the present case, the trial court effectively allowed Mr. Wetherelt and Ms. Lake to decide between themselves whether Mr. Wetherelt would be responsible for a child born during the marriage.

In *State, Dep't of Revenue, CSED v. Allsop*, 902 P.2d 790 (Alaska 1995), we held that a dissolution decree entered as a result of an uncontested summary proceeding did not disestablish paternity. The judgment of dissolution in *Allsop* adopted the pleadings on their face, including the parties' representations that there were no minor children born of the relationship. There was no separate adjudication of paternity. We concluded that "even if CSED possessed the authority to independently disestablish Allsop's paternity, it would have been justified in giving the California order very little weight." *Id.* at 796.

 The policy rationale for a rule requiring judicial involvement to disestablish paternity is apparent.

> Litigation in domestic relations cases is particularly prone to undue influence and coercion, given the often highly-charged

1983 had made the determination on legal principles that Mr. Wetherelt was not the father. A separate action was not necessary in order for Mr. Wetherelt to be found to not be the father of the child.

The court finds that given the 1983 dissolution decree, CSED should not have proceeded to collect child support from Mr. Wetherelt.

4. The legal effect of a court order is a question of law, which this court reviews *de novo. Wright v. Black*, 856 P.2d 477, 479 (Alaska 1993). The court must exercise its independent judgment and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

emotional setting in such cases. Because of this risk and the fact that the interests of the children may not be represented, Alaska law does not permit parents to unilaterally terminate parental obligations or enter into agreements waiving child support without court approval.

The State concludes that, since the 1983 dissolution decree did not terminate the legal relationship between Wetherelt and Roberta, Wetherelt owed a duty of support until 1994, when the court issued an express order declaring that Wetherelt was not Roberta's father.[5]

*Smith* and *Allsop* reflect the judicial judgment that paternity should be disestablished only by a showing of clear and convincing evidence. Such evidence was not presented to or in any way considered by the superior court when it dissolved the Wetherelts' marriage, and this absence is implicitly reflected in the contents of its order. We therefore conclude that we must reverse the superior court's holding that the 1983 dissolution decree disestablished paternity.

### B. Did CSED Abuse Its Discretion by Refusing to Disestablish Paternity?[6]

■ The superior court held that since CSED knew of the dissolution decree and

was aware of Wetherelt's claim that he had a vasectomy prior to his marriage to Mary, it "would have been up to CSED and Ms. Lake to establish a relationship of parent and child in order for CSED to proceed reasonably.... [T]he collection of funds by CSED in light of the evidence before them, without making the paternity determination, was an abuse of their discretion." The superior court's conclusion in this regard amounts to an assertion that CSED was required to disestablish paternity, since a presumption of paternity was in place at the time that CSED began collecting support from Wetherelt.[7]

The State claims that the superior court's conclusion was based on the incorrect assumption that CSED had the statutory authority to make a paternity determination. The State argues that in fact CSED lacked this authority at the time it took action in Wetherelt's case.[8]

At the time, CSED did not have the statutory authority to determine Mr. Wetherelt's paternity or nonpaternity of Roberta. CSED was only authorized to "initiate efforts to have the paternity of children born out of wedlock determined by the court." AS 25.27.040(a). Moreover, in such cases, CSED was not authorized to make the

---

5. Wetherelt's response is that the State "blurs the lines between disestablishment of paternity, and termination of parental rights." He further asserts that the 1983 dissolution decree should be treated as sufficient to overcome the presumption of paternity as required by *Smith*.

Wetherelt argues in the alternative that the dissolution decree declaring that there were no children of the marriage was valid, but subject to being set aside. Under this approach, more appropriately propounded in a legislative context, paternity would be disestablished by the decree unless and until the State filed a motion requesting that the court (re)establish paternity. Wetherelt cites *Perry v. Newkirk*, 871 P.2d 1150 (Alaska 1994), setting aside an agreement regarding child support as of the time the motion was filed by the custodian, in support of his proposition that paternity disestablishment should be treated in this manner. This reliance is misplaced, as it rests upon the incorrect equation of the Wetherelts' 1983 dissolution decree with the *Perry* agreement to waive support.

6. Whether CSED abused its discretion when it refused to disestablish paternity is a mixed question of law and fact.

Whether CSED had the statutory authority to disestablish paternity is a question of law subject to *de novo* review. *Hertz v. Carothers*, 784 P.2d 659, 660 (Alaska 1990); *McKean v. Municipality of Anchorage*, 783 P.2d 1169, 1170 (Alaska 1989).

7. In its Conclusions of Law, the superior court wrote:

CSED chose not to request and pay for paternity testing when they knew that paternity was contested. At this time, the court does not think there was any basis for them to do that. Nonetheless, they could have filed a paternity action in court themselves in 1989 in the face of conflicting evidence, and chose not to, but chose to proceed administratively....

... This court holds that the collection of funds by CSED in light of the evidence before them, without making the paternity determination, was an abuse of their discretion in this case and under these facts.

8. Effective January 1, 1996, CSED was given the authority to establish and disestablish paternity administratively. *See* AS 25.27.020(a)(11); AS 25.27.165; AS 25.27.166. These provisions were not operative at the time CSED began collecting support from Wetherelt.

determination of paternity administratively; it could only initiate such efforts *in court.* AS 25.27.040(a).

Since Mr. Wetherelt and Ms. Lake were married, the child Roberta was not born out of wedlock. There was no statutory mechanism in place at that time which would have allowed CSED to make factual findings that Roberta was not Mr. Wetherelt's child.... Because CSED was not authorized by the Alaska legislature to disestablish paternity, if Mr. Wetherelt wished to disestablish paternity, he (not CSED) had to initiate proceedings in court to de-legitimize [sic] Roberta. And, he was so informed by CSED.

(Emphasis in original, footnote omitted.)

The State argues that CSED's statutory mandate allowed it to do nothing more than inform Wetherelt of the steps he needed to take in order to disestablish paternity. Until he obtained a court order to this effect, "CSED was statutorily required to enforce [Wetherelt]'s support obligation. AS 25.27.020(a)(4); AS 25.27.080(b).[9] *CSED's collection of support cannot be deemed an abuse of discretion when it had no discretion to ignore the support obligation.*" (Emphasis added.)

■ Wetherelt cites *State, Dep't of Revenue, CSED v. A.H.*, 880 P.2d 1048 (Alaska 1994), to support the proposition that CSED was authorized to disestablish paternity before obligating Wetherelt for Roberta's support. At issue in *A.H.* was a state law entitling AFDC recipients to paternity testing at CSED's expense where there is a "contested paternity action." The mother first filed a paternity action in court and then

sought the assistance of CSED in establishing paternity in a man not her husband. CSED refused to pay for paternity testing, based on the legal presumption that the woman's husband at the time of conception was the child's father. This court concluded that CSED had a duty to pay for testing where the parties each filed affidavits to the effect that the presumption of paternity was incorrect. We stated:

For the limited purpose of construing AS 25.27.040(a) [10]—i.e., whether a paternity action is "contested"—we hold that these unimpeached affidavits constitute clear and convincing evidence sufficient to rebut the presumption of [the putative father]'s paternity and to require CSED to pay for paternity testing.

*A.H.*, 880 P.2d at 1050.

The State contends that Wetherelt's reliance on *A.H.* is misplaced. It asserts that the decision "had nothing to do with administrative disestablishment.... The only question addressed in *A.H.* was whether AS 25.27.040(a) required CSED *to pay for paternity testing to aid the parties and the court in the paternity action....* Nowhere did the court state, or even imply, that CSED had authority to administratively disestablish paternity once the testing was complete." (Emphasis added.)

Our reading of *A.H.*, in the context of the statutory framework relevant to this case, comports with the State's position. We hold that CSED lacked statutory authority to disestablish paternity and, therefore, we reverse the superior court's ruling that CSED abused its discretion by instituting enforcement of Wetherelt's support obligation without making a paternity determination.

**9.** AS 25.27.020(a)(4) states:
 The agency shall establish, enforce, and administer child support obligations administratively under this chapter.
 AS 25.27.080(b) states:
 The agency on behalf of the custodian or the state shall take all necessary action permitted by law to enforce child support orders so entered, including petitioning the court for orders to aid in the enforcement of child support.

**10.** AS 25.27.040(a) provides in part:

The agency may appear on behalf of minor children or their mother or legal custodian or the state and initiate efforts to have the paternity of children born out of wedlock determined by the court. When the agency is a party to a court action in which paternity is contested, it shall request and pay for genetic testing and procedures.... The agency may recover the costs of the tests as a cost of the court action, except that costs may not be recovered from [an AFDC recipient].

### C. Would CSED Be Unjustly Enriched if Permitted to Retain Support Collected from Wetherelt Prior to April 1993? [11]

▊ The superior court's ultimate conclusion was that CSED would be unjustly enriched if permitted to retain the money it collected from Wetherelt prior to April 1993.[12] The State argues that the superior court's application of the unjust enrichment doctrine is improper, contending that Wetherelt failed to prove the elements of the claim.[13] In particular, the State asserts that CSED did not receive "something for nothing," since the money it collected from Wetherelt was reimbursement for payments already made for the support of a child for whom Wetherelt was, at that time, legally responsible.

▊ The essence of the State's argument is that, regardless of the ultimate disposition of this matter (i.e., disestablishment of paternity), Wetherelt was responsible for supporting Roberta until he obtained a court order disestablishing paternity. The State thus suggests:

> There is nothing inequitable or unjust in allowing CSED to retain the public assistance reimbursement collected from Mr.

Wetherelt. . . . Mr. Wetherelt had a valid and enforceable obligation to pay child support for Roberta until August 1994 when a determination of non-paternity was finally issued by the court. By statute, the child support arrears which accrued under the administrative order prior to that date became judgments when due and unpaid. AS 25.27.225. Thus, the monies collected by CSED prior to August 1994 were validly owed by Mr. Wetherelt and were properly collected by CSED. . . .

> CSED collected no more than was validly owed by Mr. Wetherelt. It retained as reimbursement *no more than what it had paid to support Mr. Wetherelt's child.* CSED was unable to change the situation since it did not have the authority to disestablish paternity. . . . Under the circumstances, CSED did not receive a benefit the retention of which would be either unjust or inequitable.

We are in agreement with the State's contention that Wetherelt failed to meet the first and third prongs of the *Darling* test for unjust enrichment.[14] We therefore reverse

---

**11.** Unjust enrichment is an equitable doctrine which ordinarily falls within the trial court's broad discretion. *Alaska Sales and Serv. v. Millet,* 735 P.2d 743, 747 (Alaska 1987). Whether there has been unjust enrichment is generally a question of fact. As such, the trial court's determination should not be set aside unless clearly erroneous. *Wright,* 856 P.2d at 479. Where the facts are clearly established, the issue becomes one of law, and the court must "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin,* 591 P.2d at 1284 n. 6.

**12.** In its Conclusions of Law, the superior court determined:

> This court also holds that the State of Alaska, Child Support Enforcement Division ... received a direct benefit from the collection of child support from Mr. Wetherelt, that being the money that was collected from him and which they received.
> This court holds that to allow CSED ... to retain these funds would be inequitable.

**13.** In order to recover for unjust enrichment, a party must show:

> (1) a benefit conferred upon the defendant by the plaintiff;
> (2) appreciation by the defendant of such benefit; and

(3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.

*Darling v. Standard Alaska Prod.,* 818 P.2d 677, 680 (Alaska 1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992). In order to recover, it is not enough that a benefit was conferred on a defendant. Rather, "the enrichment to the defendant must be unjust; that is, the defendant must receive a true windfall or 'something for nothing.'" *Alaska Sales and Serv.,* 735 P.2d at 746.

**14.** *Darling,* 818 P.2d at 680. The State's position as to the third prong is quoted above. As to the first prong, the State argues:

> First, CSED did not receive "something for nothing" from Mr. Wetherelt. The state paid in advance for what it collected from Mr. Wetherelt by supporting the child to whom Mr. Wetherelt owed a legal duty of support. There is absolutely no evidence which would suggest that the state retained as public assistance reimbursement more than it paid to support the child. The state was simply reimbursed for the money spent on Mr. Wetherelt's legal obligation.

the superior court's determination that CSED would be unjustly enriched if it is permitted to retain support monies collected from Wetherelt prior to April 1993.

## IV. CONCLUSION

The superior court's rulings that the 1983 dissolution decree terminated Wetherelt's duty to support Roberta, that CSED abused its discretion by refusing to disestablish paternity, and that CSED would be unjustly enriched if permitted to retain support monies collected from Wetherelt prior to January 20, 1993, are REVERSED.[15] The superior court's judgment requiring the State to pay Wetherelt $20,118.69 plus interest, costs, and attorney's fees is REVERSED and VACATED.

---

**15.** At oral argument before this court, counsel for CSED conceded that Wetherelt is entitled to a refund of any of his wages garnished by CSED between January 20, 1993, and April 23, 1993 (January 20, 1993, being the date Wetherelt filed his motion to reaffirm non-paternity in the dissolution case).

On remand the superior court is directed to enter a modified judgment against the State requiring it to pay Wetherelt any sums garnished by CSED during this three-month period together with costs, interest, and an award of attorney's fees, if deemed appropriate.

We conclude it is unnecessary to address any other issues raised in this appeal.