Mary Ellen SOULES, Appellant,

v.

Betty RAMSTACK, Appellee.

No. S–11034.

Supreme Court of Alaska.

July 30, 2004.

34. See, e.g., Kelso v. Rybachek, 912 P.2d 536, 539–40 (Alaska 1996).

Robert C. Erwin, Erwin & Erwin, LLC, Anchorage, for Appellant.

Gordon F. Schadt, Schadt Law Office, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Mary Ellen Soules, personal representative of the Estate of Pauline King, appeals the superior court's decision holding that the estate is contractually obligated to pay a special assessment levied against a condominium that the estate sold to Betty Ramstack. Soules contracted to sell the unit to Ramstack in March 2002 and agreed to pay any assessments due at closing. The condominium association approved a special assessment in December 2001 and notified all owners of the assessment in early January 2002. Those who were then negotiating to sell their units were told that the assessment would be due at closing. The estate did not pay the assessment at closing. Because the superior court correctly ruled that the estate breached its contract with Ramstack, we af-

firm its decision requiring the estate to pay the special assessment.

## II. FACTS AND PROCEEDINGS

Pauline King died in December 2001, leaving an estate that included condominium 2F in Mt. Vernon Commons in Anchorage. At the time, the Mt. Vernon condominium community was unique in that it did not own the land upon which the units were built, but instead had a long-term leasehold interest in the property. In June 2001 the Mt. Vernon Condominium Association began negotiating with the Central Anchorage Land Company, which owned the land, to purchase it for a price of $1.8 million. On September 27, 2001 the board of directors of the condominium association held an informational meeting to discuss the proposed land acquisition, including the amount of a special assessment that would be levied against all units to finance the purchase. The condominium association proposed to finance the acquisition through a bank loan, and each homeowner was to be responsible for a portion of the purchase price payable through a special assessment. The entire transaction was subject to approval by the homeowners.

The minutes of this meeting indicate that the proposed land purchase was controversial. Elouise Schmidt, the real estate agent who later represented the estate in the transaction with Ramstack, attended the meeting on her own behalf and as a proxy for several homeowners. She opposed the land purchase. According to the minutes, while Schmidt was unsure how the land purchase would affect condominium values at Mt. Vernon, she discussed how an owner could explain the assessment to a potential buyer and how an owner could work the assessment into the sales price if a unit were offered for sale.

A special board meeting of the homeowners' association was held on December 10, 2001. Although the land acquisition was still being negotiated, the board anticipated that the homeowners would approve the transaction and that closing would occur on December 28, 2001. The board approved a special assessment to pay for the land purchase.[1] The amount of assessment varied depending on the type of condominium unit, and ranged from $11,677.54 to $13,914.60, which could be paid as a lump sum or in installments. The assessment due on unit 2F was $13,139.57.

The board notified homeowners on January 11, 2002 that the special assessment had been levied, informing them a majority of the homeowners had approved the land purchase, the amount they were required to pay, and where and how to pay the assessment. This letter also informed homeowners that the association was negotiating with the bank for better loan terms and that if the transaction was not completed, any payments made would be refunded with interest. A second letter sent on January 16, 2002 explicitly informed homeowners who were attempting to sell their units that the "special assessment [was] on the unit and due upon closing." The letter encouraged such homeowners to "[i]nstruct your closing agent to deposit those funds in [the special assessment] account at Northrim Bank."

The proposed land acquisition presented many challenges because, according to Michael Olson, Vice President of the Board, it was the first time in Alaska that an existing condominium association had attempted to convert leasehold land to fee simple ownership, and in February the deal was temporarily derailed when the parties reached an impasse. After further negotiations the deal was reinstated on the same financial terms. In a special board meeting on March 27, 2002 the board voted to seek a new closing date of May 1, 2002 and to impose a deadline for payment of the special assessment, the amount of which was unchanged since it was reported to homeowners in January. The board set a deadline of April 30, 2002 for partial or total payment of the special assess-

---

1. The corporate resolution authorizing the special assessment was not actually signed by the secretary until July 14, 2002. However, the resolution, the minutes of the December special board meeting, and testimony from Michael Ol- son, Vice President of the Board, indicate that the assessment was effective as of December 10, 2001 when the resolution was adopted. The superior court found Olson's testimony to be fully credible.

ment and notified all homeowners of this date in writing on April 3, 2002.

Meanwhile, King's estate had listed her condominium for sale with Schmidt in March of 2002. The listing announcement indicated that the condominium association was still working on the land acquisition and specified the amount of the monthly land lease, but it did not mention the special assessment already announced by the association. Ramstack submitted an earnest money agreement on March 20, which provided that assessments on the property would be paid by the seller. The estate accepted the earnest money agreement on March 22. A resale certificate obtained by the estate on April 10, and provided to Ramstack on April 11, was accompanied by a disclosure statement[2] that indicated that there were no unpaid "common expenses" on the unit. Ramstack purchased the condominium on April 19. The monthly land lease and condo fees owing on the unit were collected from the estate. However, the special assessment was not included in the settlement charges due from the estate or the buyer.[3] Ramstack first learned of the special assessment on or about April 25, 2002 when she took her monthly land lease payment to Michael Olson, who informed her that she actually owed over $13,000. On May 29, 2002 the association claimed a lien against all units that had not paid the assessment, including the unit purchased by Ramstack. The association finally purchased the land on September 6, 2002.

Ramstack filed a creditor's claim against the estate on June 13, 2002, seeking to enforce the terms of the contract by collecting $13,139.57 to pay the special assessment charged to her unit. Following a two-day bench trial on February 11 and 12, 2003 Superior Court Judge Mark Rindner issued a decision on March 10, 2003 holding the estate liable for the unpaid special assessment.

The superior court found that the board had levied the special assessment through a duly enacted resolution at the December 10, 2001 special meeting and that it remained valid throughout the negotiations to purchase the land. The superior court further found that the estate had agreed to pay all assessments owed on the condominium at closing, including the special assessment. Finally, the superior court rejected the estate's argument that Ramstack would be unjustly enriched if the estate were forced to pay the assessment without the benefit of a higher sales price, noting that Ramstack may not have even contracted to buy the unit had she known of the assessment, and that requiring the estate to honor its contract would merely give Ramstack the benefit of her bargain. The court ordered the estate to pay the special assessment.

Soules appeals on two grounds. First, she claims that, because the special assessment was not due on April 19, 2002 when the estate sold the condominium to Ramstack, the estate bore no obligation to pay the assessment at that time. Second, she claims that Ramstack will be unjustly enriched if the estate is required to pay the assessment.

## III. STANDARD OF REVIEW

▮ Whether the assessment was due at the time of closing presents a mixed question of law and fact, which we review using two different standards.[4] Factual determinations are reviewed under the clearly erroneous standard.[5] We will find clear error only if, after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made.[6] Legal questions are reviewed *de novo,* and we will adopt the rule of law that is most persuasive in light of

---

**2.** The original disclosure statement was not available at trial, but a statement from a similar transaction was introduced.

**3.** Ramstack's real estate agent testified that the buyer and seller typically do not see the other's settlement statement, thus the fact that the special assessment was not included in the buyer's settlement statement would not have alerted Ramstack to any potential problem.

**4.** *Carr–Gottstein Props., Ltd. P'ship v. Benedict,* 72 P.3d 308, 310 n. 4 (Alaska 2003).

**5.** *Id.* at 310.

**6.** *Rausch v. Devine,* 80 P.3d 733, 737 (Alaska 2003).

precedent, reason, and policy.[7] "Whether there has been unjust enrichment is generally a question of fact."[8] But "[w]here the facts are clearly established, the issue becomes one of law, and the court must 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[9] Additionally, the trial court's findings regarding the credibility of the witnesses will be reversed only if clearly erroneous.[10] We can affirm the decision of the superior court on any basis supported by the record.[11]

## IV. DISCUSSION

The primary question presented by this appeal is whether the special assessment enacted by the board on December 10, 2001 and announced to homeowners in January 2002 was due on the date of closing and thus payable by the estate by the terms of its contract with Ramstack. Soules argues that the estate was not contractually bound to pay the assessment because it was not due until April 30, 2002, eleven days after it sold the condominium to Ramstack.

### A. The Special Assessment Was a Debt at Closing.

The board of the Mt. Vernon Commons Condominium Association voted to levy a special assessment on December 10, 2001, a fact reflected in the minutes of the special board meeting, the corporate resolution, and the testimony of Michael Olson, whom the superior court found to be fully credible. This decision was communicated to homeowners in letters dated January 11 and 16, 2002, along with the amount due from each homeowner, including the interest rate applicable to installment payments. Although the board did not vote to impose a deadline for payment until the March 27, 2002 special board meeting, the January correspondence specifically informed homeowners who were negotiating to sell their units that the "spe-

cial assessment is on the unit and due upon closing" and encouraged them to ensure that the closing agent deposited the funds in a special account set up for that purpose.

■ The question is whether the assessment existed as an obligation of the estate prior to the sale of the unit or whether the assessment became effective only on April 30, 2002 and was thus payable by Ramstack. Resolution of this question requires us to determine when a condominium assessment becomes effective and whether the special assessment at Mt. Vernon Commons was an existing obligation when Ramstack purchased unit 2F from the estate.

Soules raises two arguments in support of her position that the estate is not contractually obligated to pay the assessment, both of which rely on the April 30 deadline for paying the assessment. First, she argues that, in the absence of an express provision in an association's bylaws, an assessment is not payable until a condominium association has statutory authority to attach a lien against a unit to enforce collection. She relies upon AS 34.08.470, which provides that a lien attaches from the date an assessment is due, to support her argument that the assessment was only effective when it was due. Second, Soules argues that the assessment was a contingent liability when the estate contracted to sell the condominium to Ramstack, and that the liability only became definite on April 30 when the assessment was due. Under both arguments, Soules claims that since the assessment was not due until after the estate sold the unit on April 22, 2002 the estate bore no duty to pay the assessment.

While the condominium association's bylaws do not indicate when a special assessment is effective, Soules notes that AS 34.08.470, a provision of the Uniform Common Interest Ownership Act,[12] states that a

**7.** *Carr–Gottstein,* 72 P.3d at 310 (citing *Bennett v. Bennett,* 6 P.3d 724, 726 (Alaska 2000)).

**8.** *State, Dep't of Revenue v. Wetherelt,* 931 P.2d 383, 390 n. 11 (Alaska 1997).

**9.** *Id.,* quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**10.** *Rausch,* 80 P.3d at 737.

**11.** *Id.*

**12.** Ch. 95, SLA 1985. The Uniform Common Interest Ownership Act applies to condominium communities created after January 1986. AS 34.08.010. Mt. Vernon Commons was established in 1974 and the bylaws state that it is governed by the Horizontal Property Regimes Act, AS 34.07. Because the Uniform Common

condominium association has a lien on a unit for an assessment from the time the assessment becomes due.[13] According to Soules, if no lien could attach against the unit until after April 30 then no debt was due and the association could pursue no action for collection. Her argument reduces to a syllogism: if no lien could attach, no debt was payable; if no debt was payable, the assessment had not been levied; if the assessment had not been levied, the estate did not breach its contract.

While this argument has the virtue of simplicity, it misses an important point: An assessment does not become valid only when it attaches as a lien. Debts can exist before they are due, and condominium assessments can be effective before they must be paid. Condominium associations in most states have statutory authority to attach liens as a collection mechanism to ensure that homeowners pay the fees it has assessed.[14] Alaska Statute 34.08.470 describes one way for an association to collect assessments from recalcitrant homeowners: It grants the authority to impose liens to collect unpaid assessments, it allows these liens to attach from the time an assessment is due, and it gives these liens priority over other types of liens and encumbrances.[15] But it says nothing about when an assessment itself becomes effective. A condominium association also has other means available to encourage the timely payment of assessments, including authority to impose late fees and fines [16] and to charge up to an eighteen percent interest rate on unpaid balances.[17]

■ Indeed the typical sequence by which an association adopts, announces, and collects assessments implies that an assessment will be effective before it is due, and almost certainly before the association could attach a lien against a unit to compel payment. Typically an association board will adopt a budget for planned expenses, enact an assessment to meet these expenses, set a deadline for payment and, if the assessment remains unpaid, pursue various collection strategies ranging from sending a reminder letter, charging interest, attaching a lien, and even foreclosing on a unit.[18] But the assessment exists even though it might not be immediately payable. Allowing a period of months before payment is due is particularly important where, as here, the association levied an assessment of more than $13,000, greater than ten percent of the value of the condominium, which sold for $126,900. When the announcement of an assessment predates the due date, the assessment is best viewed as an unmatured obligation, a debt for which the sum is certain though the time for payment is deferred.[19] Though the time for payment had not yet passed when the estate sold unit 2F to Ramstack, the assessment existed as an obligation of the estate from the time it was enacted. Because the assessment was an existing obligation when the estate contracted to sell the unit, the superior court correctly found that the estate bore the obligation of paying the assessment.

Soules argues that the assessment was a contingent liability rather than an unmatured obligation, because the assessment would only become a debt when "all events [had] occurred which fix and determine the liability of the debtor." A contingent liability is a liability that depends upon the occurrence of a future and uncertain event.[20] But Soules's argument would mean that the assessment

Interest Ownership Act does not resolve the question of when an assessment becomes effective, we need not address whether it would apply to the activities of the Mt. Vernon Commons Condominium Association.

13. AS 34.08.470(a).

14. See Gary A. Poliakoff, LAW OF CONDO OPERATIONS §§ 5.15, 5.23 (1988).

15. AS 34.08.470(a)-(b).

16. AS 34.08.320(a)(11).

17. AS 34.08.460(b).

18. See Wayne S. Hyatt, CONDOMINIUM AND HOMEOWNER ASSOCIATION PRACTICE: COMMUNITY ASSOCIATION LAW § 6.07(a)(1) (3d ed.2000) (describing sequence of levying and collecting assessments).

19. See Consol. Constr. Servs., Inc. v. Simpson, 372 Md. 434, 813 A.2d 260, 269 (Md.2002) (defining unmatured debt).

20. BLACK's LAW DICTIONARY at 926 (7th ed.1999).

was not valid until the association closed on the land, because that is when the event finally occurred which fixed the liability of each unit owner. That claim is clearly wrong.[21] The transaction did not finally close until September 6, 2002. If the assessment was contingent upon the land transaction being completed, it was not due until September 6, notwithstanding the fact that the assessment was voted in December and announced in January, payment was due in April, and liens attached against unpaid units in May. But even Soules acknowledges that payment was due on April 30, 2002.

The validity of the assessment was not contingent upon whether the association purchased the land. Had the land transaction irreparably fallen apart, the assessment payments would have been refunded with interest. Though the assessment was not due until April 30, when the estate sold the unit to Ramstack, payment of the assessment was contingent upon nothing but the passage of time. Thus the assessment must be viewed as an unmatured debt rather than a contingent liability.

The superior court found that the board enacted a special assessment on December 10, 2001, that it communicated the amount due from each homeowner in January 2002, and that the assessment remained valid even though the association continued to negotiate the terms of the transaction with the seller and the bank. These factual findings are not clearly erroneous. Correspondence from the association specifically instructed owners who were selling units to withhold the assessment at closing and informed them that any funds paid would be refunded with interest in the event that the land transaction was not completed. Although the association did not initially impose a due date, Michael Olson testified that the board hoped that owners would pay the assessment before the association purchased the land so that these funds could be used as a down payment. When the transaction was renewed on March 27, 2002

the board set an April 30 deadline for payment. The amount assessed against each unit remained unchanged at least from the initial communication to homeowners on January 11, 2002. Under these circumstances, the superior court correctly ruled that the assessment was a debt of the estate at the time of closing.

The superior court also found that Schmidt was fully aware of the status of the land transaction and the special assessment, but that this information was not disclosed to Ramstack or her agent. Because the estate had greater knowledge of the pending assessment, the superior court correctly ruled that the estate bore the burden of exempting the special assessment from its contractual agreement with Ramstack if it wished to avoid its obligation to pay the assessment.

**B. Ramstack Will Not Be Unjustly Enriched if the Estate Must Pay the Assessment.**

 Soules also argues that Ramstack will be unjustly enriched if the estate is required to pay the special assessment, because the unit is now worth more with a fee interest in the land and Ramstack paid a purchase price based upon the value with only a leasehold interest. The superior court rejected this argument for three reasons. First, it noted that the estate's own agent had previously stated that she was unsure how the land purchase would affect real estate values, rendering the unjust enrichment theory problematic at best. Second, there was no evidence that Ramstack would have purchased the unit had she known that the ultimate purchase price would be more than $13,000 higher than the contracted amount. Finally, and most importantly, the court found that Ramstack was not receiving a windfall, but merely the benefit of her bargain. We agree. An "allegation of unjust enrichment will succeed only when 'the defendant has received a benefit from the

---

21. The record does show that the proposed closing date was postponed several times after the assessment was first announced. In December 2001 the board projected a December 28 closing date. When the assessments were announced to homeowners on January 11, 2002 the board an-

ticipated a late January closing date. On April 3, when the board announced that the transaction had been reinstated and set the April 30 deadline for paying the assessment, it projected a May 1 closing. Closing finally occurred in September.

plaintiff and it would be inequitable for the defendant to retain the benefit without compensating the plaintiff for its value.' "[22] But there can be no valid claim of unjust enrichment where a party has given fair consideration or value for the benefits obtained.[23] The contract between Ramstack and the estate specified that the latter would pay any assessments against the unit. But the estate did not pay. Enforcement of a valid contract does not constitute unjust enrichment.

## V. CONCLUSION

Because the Estate of Pauline King contractually agreed to pay any assessments owed on the condominium, and because a special assessment was imposed prior to closing, we AFFIRM the decision of the superior court that the estate is contractually obligated to pay the special assessment.

---

**22.** *Crittell v. Bingo,* 83 P.3d 532, 538 (Alaska 2004) (quoting *Sparks v. Gustafson,* 750 P.2d 338, 342 (Alaska 1988)).

**23.** *Alaska Sales & Serv. Inc. v. Millet,* 735 P.2d 743, 746 (Alaska 1987).

