*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRADLEY K. LAYBOURN, | ) | |
| ALAN D. LAYBOURN, | ) | Supreme Court Nos. S-15478/15488 |
| DOUGLAS K. LAYBOURN and | ) | |
| DIAMOND D. LAYBOURN, | ) | Superior Court No. 3PA-11-02919 CI |
| | ) | |
| Appellants and | ) | O P I N I O N |
| Cross-Appellees, | ) | |
| | ) | No. 7068 - December 11, 2015 |
| v. | ) | |
| | ) | |
| CITY OF WASILLA, | ) | |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Brad D. DeNoble, Eagle River, for Appellants. Thomas F. Klinkner, Birch Horton Bittner & Cherot, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.       INTRODUCTION

Property owners granted a utility easement to the City of Wasilla in exchange for the City's promise to build an access road across their property, subject to

obtaining permits and funding. The access road was not built, and the property owners sued the City, claiming that it fraudulently induced them to sign the easement agreement, breached the agreement, and breached the covenant of good faith and fair dealing.

After trial the superior court made findings of fact and conclusions of law about the parties' negotiations, their reasonable expectations, the key provisions in the easement agreement, and the City's efforts to satisfy the agreement's conditions, and it ruled against the property owners on all their claims. The property owners appeal. The City cross-appeals, contending that the property owners' claims should have been dismissed on statute of limitations grounds.

We agree with the superior court's interpretation of the parties' agreement and find no clear error in its findings of fact. We therefore affirm its judgment in favor of the City and do not reach the issue raised in the City's cross-appeal.

## II. FACTS AND PROCEEDINGS

### A. Facts

Bradley, Alan, Douglas, and Diamond Laybourn own a piece of property south of the Parks Highway, between a subdivision on the east and the City of Wasilla's new multi-use sports complex on the west. The site of the sports complex had no preexisting infrastructure for water or sewer, so before construction the City approached the Laybourns in the fall of 2002 seeking a utility easement over the northern 60 feet of their property.

Archie Giddings, the City Engineer at the time, represented the City in negotiations with Bradley Laybourn, who represented the property owners. Giddings told Bradley that the City had limited options and that a utility easement through the Laybourns' property would be the most cost-effective one. In accordance with the City's usual practice, Giddings offered the Laybourns a waiver of the sewer payment-in-lieu-of-assessment (PILA) fees or construction of a maintenance trail in exchange for the

easement; the Laybourns rejected this initial offer. Countering, the Laybourns said they would allow the utility easement in exchange for both the PILA waiver and the City's construction of an access road that would run across the northern edge of their property, from South Mack Drive on the west (where the sports complex was being built) to their property's northeast corner. It was Giddings's view, however, that a road dead-ending in the Laybourns' property would serve no public purpose; he envisioned instead that the access road would continue east from the Laybourns' property to connect with Lake Lucille Drive (or Upper Road, a stub extending west from West Lake Lucille Drive), thus creating an alternate thoroughfare to the Parks Highway from the subdivisions near Lake Lucille.

Giddings and the Laybourns continued their negotiations in several meetings over the course of six months. Giddings then drafted the terms of a public utility easement agreement, which the Laybourns signed on May 29, 2003. The agreement granted a public water and sewer easement to the City on the northern 60 feet of the Laybourns' property in exchange for the following consideration:

1) The City will not charge a sewer connection fee or sewer PILA (payment in-lieu of assessment) for future development on the grantor's property.

2) In 2003, the City will apply for a public use easement across parcel D2[1] in conjunction with a public use easement across parcel C2,[2] to provide access from Upper Road to South Mack Drive; and

---

[1]   "D2" refers to the parcel on which the sports complex was being built.

[2]   Giddings testified at trial that the references to "C2" in paragraphs 2 and 3 of the agreement should have been "C1," the Laybourn property. This is not disputed.

3)    In 2004, the City will apply for a wetlands permit to construct the access road that will include the dredging of fill material and a delineation of wetlands on parcel C2; and

4)    Upon approval of the public use easement and wetlands permit, the City will construct the access road in 2005, subject to funding.

The City installed the water and sewer lines in the granted easement in the summer of 2003. Around the same time, as required by the agreement's second provision, the City applied for the public use easement necessary for construction of the Upper Road extension and received conditional approval of it from the Matanuska-Susitna Borough Platting Division.[3]

Completing the conditions for final approval of the easement would have cost the City approximately $5,000, funds Giddings believed it imprudent to spend in the absence of a wetlands permit. The entire estimated cost of the Upper Road extension was approximately $500,000. The City's local sources of funding for all its capital improvements City-wide — for water and sewer systems, roads, the airport, and buildings — averaged approximately $1.2 million in 2003 and subsequent years. Construction of the sports complex was a $20 million project which the City financed in part with bonding of $14.7 million. To pay the debt service on the bonds, the Wasilla City Council raised the City sales tax by ordinance from 2.0% to 2.5%; proceeds from the tax increase were dedicated to that purpose.[4] The City therefore depended upon state

---

[3]    The conditions for final approval included surveying and marking the proposed easement, obtaining a legal review of the easement's description, and recording certain documents.

[4]    Under Ordinance Serial No. 01-55(AM), adopted by the Wasilla City Council in December 2002, the sales tax increase was to remain in effect until the earlier

(continued...)

and federal funding for many aspects of the sports complex project, including ballfields, paving, kitchen facilities, and water and sewer lines. Giddings testified that the City initially planned to pay $50,000 toward the Upper Road extension and look to the State for the remaining $450,000 of its estimated cost. The City included the Upper Road extension in its funding requests to the legislature in 2005 and again in 2006, but the legislature rejected the request both times.

The City did not apply for a wetlands permit in 2004, as required by the easement agreement's third provision. When Giddings began the application process toward the end of that year, he realized he would need someone with engineering expertise to delineate the wetlands as required for the application's completion. This would require funding; in May 2006, therefore, Giddings asked the City Council to authorize a contract at an estimated cost of approximately $50,000 for the permitting and design of the Upper Road extension, to include the cost of the engineer.

At a City Council meeting, several citizens voiced their opposition to the Upper Road extension, and by a vote of five to one the Council denied Giddings's authorization request. In the face of this lack of public and City Council support, Giddings dropped the Upper Road extension from the list of capital projects for which the City sought funding from the State during the 2007 legislative session. The City never finished delineating the wetlands or applying for the wetlands permit.

B. **Proceedings**

The Laybourns filed suit against the City in 2011. In an amended complaint

---

[4](...continued)
of June 30, 2012, or the projected date the City was able to retire the bonds. In accordance with these terms, Ordinance Serial No. 10-19 repealed the sales tax increase as of July 1, 2010. A reserve fund of $378,163 — intended to pay for future capital improvements to the sports complex — remained after the complex was paid for.

they asserted, among other things, that (1) the City made misrepresentations of fact and omitted facts it had a duty to disclose during the course of negotiations; (2) the City's failure to apply for a wetlands permit and to construct the access road breached the terms of the agreement and the implied covenant of good faith and fair dealing; and (3) the agreement should be rescinded because of the Laybourns' unilateral mistake. The Laybourns sought specific performance of the agreement (as they interpreted it) or, alternatively, rescission and damages, including punitive damages.

The City moved for partial summary judgment on the Laybourns' contract claims, arguing they were subject to a three-year statute of limitations.[5] The superior court denied the motion, ruling that the claims were subject instead to the six-year limitations period for waste or trespass on real property.[6]

The superior court then held a three-day bench trial. In written findings of fact and conclusions of law, the court rejected both the Laybourns' characterization of the parties' negotiations and their interpretation of the agreement's key provisions. The court found that the City made no misrepresentations and omitted no material facts it had a duty to disclose; it also concluded that the Laybourns' claims for breach of contract and breach of the implied covenant of good faith and fair dealing failed because the agreement expressly conditioned construction of the access road upon available funding and obtaining a wetlands permit, conditions that did not occur despite the City's reasonable efforts. The court found for the City on all the Laybourns' claims and entered final judgment in the City's favor.

The Laybourns appeal the judgment against them, claiming both clear

---

[5]     AS 09.10.053 (requiring that "an action upon a contract or liability" be brought within three years).

[6]     AS 09.10.050 (requiring that "an action for waste or trespass upon real property" be brought within six years).

errors of fact and mistakes of law.  The City cross-appeals the denial of summary judgment on its statute of limitations defense.

## III.   STANDARDS OF REVIEW

We review the superior court's interpretation of a contract de novo.[7] "When interpreting a contract, the goal 'is to give effect to the reasonable expectations of the parties.' "[8] "Where the superior court considers extrinsic evidence in interpreting contract terms, . . . we will review the superior court's factual determinations for clear error."[9]

Whether there has been a breach of contract or the covenant of good faith and fair dealing is a question of fact reviewed for clear error.[10]  We review "findings of fact by the superior court on issues of misrepresentation under the clearly erroneous standard"[11] and "give particular deference to the superior court's factual findings when . . . they are based primarily on oral testimony, because the superior court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[12]  We will find clear

---

[7]      *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 315 (Alaska 2013).

[8]      *Id.* (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[9]      *Id.* (quoting *Cook v. Cook*, 249 P.3d 1070, 1077-78 (Alaska 2011)) (internal quotation marks omitted).

[10]      *See Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004); *see also Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 283 (Alaska 2004).

[11]      *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 984 (Alaska 2009).

[12]      *3-D & Co. v. Tew's Excavating, Inc.*, 258 P.3d 819, 824 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

error only when "after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made."[13] We review all factual findings "in the light most favorable to the prevailing party below."[14]

We review for abuse of discretion a trial court's denial of rescission of a contract due to unilateral mistake.[15]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding That The City Did Not Fraudulently Induce The Laybourns To Sign The Easement Agreement.

The Laybourns first contend that the superior court erred when it failed to find that the City fraudulently induced them to enter into the easement agreement by misrepresenting material facts and omitting facts it had a duty to disclose. We conclude that there was no error. To address the Laybourns' argument we turn first to the language of the parties' agreement.

#### 1. The easement agreement was unambiguously conditional.

"A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."[16] Because conditions are disfavored, "[t]o be enforceable, a condition must be 'expressed

---

[13]     *Id.* (quoting *Soules v. Ramstack*, 95 P.3d 933, 936 (Alaska 2004)).

[14]     *Id.* (quoting *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005)).

[15]     *Dickerson v. Williams*, 956 P.2d 458, 466-67 (Alaska 1998).

[16]     *Jarvis v. Ensminger*, 134 P.3d 353, 358 (Alaska 2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981)).

in plain, unambiguous language or arise by clear implication.' "[17] The fourth provision of the parties' agreement says: "Upon approval of the public use easement and wetlands permit, the City will construct the access road in 2005, subject to funding." The superior court interpreted this language to mean that "[t]he City's obligation to build a road was unambiguously conditioned upon available funding and permitting approval." The court concluded that the Laybourns' contrary interpretation "fails as a matter of common sense given the totality of the circumstances involved in this project and the plain, everyday meaning of the key provisions contained within the agreement." We agree with the superior court's reading of the agreement.

The Laybourns argue that "subject to funding" is not a condition but instead is "meant to qualify the year the City is to construct the access road" — that is, it is a statement that the project will be done in 2005 if enough tax revenue has accumulated by then and that otherwise it will be done later. The Laybourns contend that if funding was meant to be a condition, it would have been listed at the beginning of the sentence with the other conditions: approval of the public use easement and the wetlands permit. The Laybourns say they minimized the importance of the agreement's "subject to funding" language because they believed funding to be a "foregone conclusion," in that "the only contingency in [the] agreement was the passage of enough time to accumulate funding for the project from an increase in the City's sales tax."

A court's object in interpreting any contract term is to "give effect to the reasonable expectations of the parties."[18] The court "looks to the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic

---

[17] *Id.* (quoting *Prichard v. Clay*, 780 P.2d 359, 362 (Alaska 1989)).

[18] *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981).

evidence, and case law interpreting similar provisions."[19]  Extrinsic evidence may include "the nature of the business, the parties' negotiations, and the structure of the [a]greement."[20]

The language of the disputed provision supports the superior court's conclusion that it is an express condition.  Considering the "ordinary, contemporary, common meaning"[21] of "subject to" used in a contract, we note that other courts have determined the phrase to be unambiguous as imposing a condition precedent on a party's duty of performance.[22]  Giddings's testimony supports a finding that the parties intended this common meaning.  Addressing the Laybourns' perception that funding was a "foregone conclusion," Giddings testified it would render the "subject to funding"

---

[19]     *Id.*; *see also Wright v. Vickaryous*, 598 P.2d 490, 497 n.22 (Alaska 1979) (holding that regardless of whether the plain terms of the contract appear ambiguous, courts may use extrinsic evidence related to the parties' intent to interpret a contract).

[20]     *Cook v. Cook*, 249 P.3d 1070, 1079 (Alaska 2011).

[21]     *Kay v. Danbar, Inc.*, 132 P.3d 262, 269 (Alaska 2006) ("[T]he words of the contract remain the most important evidence of intention and, unless otherwise defined, are given their 'ordinary, contemporary, common meaning.' " (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1001 n.3 (Alaska 2004)) (footnotes omitted)).

[22]     *See, e.g.*, *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488-89 (5th Cir. 2007) (holding that contract providing that assignment was "subject to" other party's consent expressly indicated a condition precedent); *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1263 (10th Cir. 2006) (holding that contract providing that contractor's duty to pay subcontractor was "subject to" payment by owner was "indicative of the creation of a condition precedent"); *Cranpark, Inc. v. Rogers Grp., Inc.*, 721 F. Supp. 2d 613, 627 (N.D. Ohio 2010), *rev'd on other grounds*, 498 F. App'x 563 (6th Cir. 2012) ("The language 'SUBJECT TO . . . APPROVAL' clearly imposes a condition precedent."); 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38:16 (4th ed. 2009) ("[T]he words 'subject to' in a contract usually indicate a condition to one party's duty of performance and not a promise by the other.").

provision meaningless.[23]  He testified:

> [I]n 2003 the City can't guarantee we can build a road.  We don't have permits, we don't have funding.  Without funding and permits — as it's pointed out earlier, you need all three of these things.  If I have any two of these things, I can't build the road.  I can have all the money in the world and no [Army] Corps permit.  I could have a [public use easement] and money and the Corps would say, no, there's some critical wetlands there.

Giddings testified that if the project had *not* been subject to funding — if it was dependent solely on the accumulation of sales tax revenues, which are "real predictable" — the agreement would have said that the project "won't be subject to funding — the funding will be ready on this date if it's [solely dependent on the] sales tax."

The Laybourns contend, however, that "it defies all common sense" to believe they would have agreed to an exchange in which the City's performance was completely contingent on events — funding and the approval of permits — that were ultimately beyond the City's control.  But the superior court found that they *did* agree to that exchange.  It found that over the course of the six-month negotiation "there was considerable give and take regarding the consideration that the City would provide in exchange for the easement" and that "[t]he Laybourns enjoyed significant bargaining power over the City to influence the key terms placed into the utility [e]asement document."  These findings are not clearly erroneous and support the superior court's conclusion that the City's obligation to construct the access road was unambiguously conditional and that the parties should reasonably have understood it in that way.

---

[23]     *See Calais Co. v. Ivy*, 303 P.3d 410, 418 (Alaska 2013) (relying on rule disfavoring contract interpretation that renders contract terms meaningless).

**2. The superior court did not clearly err in finding that the City did not misrepresent material facts or fail to disclose facts it had a duty to disclose.**

The Laybourns contend that the City, through Giddings, made three misrepresentations of material fact during the negotiations that induced them to enter into the easement agreement. They contend that the City misrepresented (1) the access road's planned extent (i.e., that it would not end on the Laybourns' property, as they thought, but rather would reach Lake Lucille Drive on the east);[24] (2) the source of the funding (i.e., that it was dependent on state legislative action rather than simply the accumulation of City sales tax revenues); and (3) the conditional nature of the agreement (i.e., that the City's obligation to build the road depended on both permitting and funding, neither of which was guaranteed). They further contend that the City omitted the important facts that the project was subject to public notice and comment as well as further approvals.

To prevail on their misrepresentation claim, the Laybourns were required to prove the existence of either an affirmative misrepresentation[25] or an omission where there was a duty to disclose.[26] The superior court found, however, that they failed to

---

[24] The Laybourns contend that Giddings's unilateral decision to seek a longer access road than the Laybourns had in mind substantially increased its cost and "subject[ed] it to more review, public notice and comment, approvals and time."

[25] Fraudulent, negligent, and innocent misrepresentation all have a common element: the affirmative misrepresentation of a material fact. *See Asher v. Alkan Shelter, LLC*, 212 P.3d 772, 782 (Alaska 2009) (stating elements of fraudulent misrepresentation claim); *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 671 (Alaska 2002) (stating elements of negligent misrepresentation claim); *Bevins v. Ballard*, 655 P.2d 757, 761-62 (Alaska 1982) (stating elements of innocent misrepresentation claim against real estate broker), *superseded by statute*, AS 34.70.010 *et seq.*, *as recognized in Amyot v. Luchini*, 932 P.2d 244, 246 (Alaska 1997).

[26] *See Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, (continued...)

prove any misrepresentation of fact. As for the alleged omissions, the court concluded that "the City has no duty to disclose those facts that the Laybourns are expected to discover by ordinary inspection and inquiry," such as that City sales tax revenues were already dedicated by ordinance to pay debt service on the bonds and that the City had to look elsewhere for money to fund most of its capital projects.

The superior court acknowledged that "[t]he testimony at trial described two very different perspectives of the same transaction." Since the findings as to the parties' stated positions during the negotiations depended on the credibility of the participants, we defer to the superior court's resolution of conflicts in their testimony as to what was disclosed and what was not.[27] Evidence at trial supported the superior court's finding that there were no misrepresentations. About the length of the road, Giddings testified that if it dead-ended in the Laybourns' property, thus benefitting only the Laybourns, the project "[wouldn't] pass the straight-face test in Juneau, [or] at a council meeting"; he therefore "pitched [the project] to the Laybourns" as extending all the way to Lake Lucille Drive, providing a bona fide public benefit because it operated "as a secondary outlet" from the neighborhoods to the Parks Highway. On the subject of permitting, although he acknowledged it was "possible" the Laybourns misinterpreted his "air of confidence" as meaning "this is a done deal," he testified that he would never have guaranteed a project unconditionally unless he "had the permits in hand and the funding," and in this case he had neither. As for funding, he testified there was "no time

---

[26](...continued)
1202 (Alaska 1998).

[27] *See Adams v. Adams*, 131 P.3d 464, 467 (Alaska 2006) ("Because the superior court was in the best position to assess the demeanor and credibility of all the witnesses, we will follow our normal practice of 'consistently grant[ing] deference to trial courts where credibility is at issue.' " (alteration in original) (quoting *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1136 (Alaska 2001))).

that we ever contemplated or communicated that we were going to put sales tax in to fund this road." He testified that he told the Laybourns that the City would have to seek funding from other sources and "[he didn't] think [the Laybourns] had an issue with that." He testified that he "never got close to saying" that the construction of the road was "a done deal"; that he never guaranteed the Laybourns that it was a "foregone conclusion"; and that because any one of three steps — the public use easement, the wetlands permit, and the funding — could "derail the project," "the City was not prepared to guarantee anything in writing." The superior court's finding that the City made no misrepresentations of material fact is thus supported by Giddings's testimony, which the superior court found credible, and the finding is not clearly erroneous.

We also reject the Laybourns' argument that the City omitted material facts it had a duty to disclose. "The duty to disclose arises when facts are concealed or unlikely to be discovered because of the special relationship between the parties, the course of their dealings, or the nature of the fact itself."[28] The duty "is rarely imposed where the parties deal at arm's length and where the information is of the type which the buyer would be expected to discover by ordinary inspection and inquiry."[29] The parties to this case did not have a prior course of dealing. Nor did they have a special relationship; as the superior court found, they dealt at "arm's length" over a six-month period during which the Laybourns exercised "significant bargaining power." We also find no clear error in the superior court's determination that the information the

---

[28] *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 810 P.2d 1015, 1019 (Alaska 1991) (citing *Matthews v. Kincaid*, 746 P.2d 470, 471-72 (Alaska 1987) (adopting RESTATEMENT (SECOND) OF TORTS § 551(2) (1977))).

[29] *Matthews*, 746 P.2d at 472; see also *Deptula v. Simpson*, 164 P.3d 640, 646 (Alaska 2007) (finding no special relationship when real estate professional represented both parties in an arms-length commercial transaction).

Laybourns allege was omitted — largely having to do with the inner workings of local government and its sources of funding for capital projects[30] — was of a kind not uniquely available to the City but rather was "either spelled out in the agreement or matters of public record," and it thus was of the type that one "would be expected to discover by ordinary inspection and inquiry."[31]

> **3.     The superior court did not clearly err in finding that the Laybourns benefitted from the easement agreement.**

Finally, we reject the Laybourns' argument that the easement agreement was so obviously one-sided they would not have agreed to it absent fraud by the City. The superior court found that the Laybourns benefitted from the agreement regardless of whether the access road was built. They gave the City an easement with a fair market value of $2,900 and received in exchange a payment-in-lieu-of-assessment waiver with a potential value of $32,000, depending on how their property was subdivided. In addition, their property more than doubled in value between 2003 and 2013, leading the superior court to conclude that "[t]here is no question that the value of the [p]roperty with preinstalled water and sewer utility lines has benefitted the Laybourns." These findings of fact are not clearly erroneous.[32]

---

[30]     The Laybourns contend that they could not be expected to know "what approvals are necessary, who has what authority within the City, what authority the City Council has over any aspect of the [a]greement, the availability of funding, how long it takes to accumulate funds or fund a project, what parts if any of the [a]greement are subject to public comment and notice, how long the process takes[,] and so forth."

[31]     *Cf. Matthews*, 746 P.2d at 472 (observing that "the lack of off-street parking is an obvious fact which the ordinary purchaser would be expected to discover, by ordinary inspection and inquiry, before she bought the property advertised for sale").

[32]     The same rationale leads us to reject the Laybourns' claim that they were entitled to rescind the contract due to a unilateral mistake of fact. A unilateral mistake
(continued...)

Having considered the language of the agreement and the superior court's findings of fact, we affirm the superior court's decision that the agreement was expressly conditional and its finding that the Laybourns were not fraudulently induced to sign it.[33]

## B. The Superior Court Did Not Clearly Err In Finding That The City Did Not Breach The Easement Agreement Or The Implied Covenant Of Good Faith And Fair Dealing.

"If [a] condition is not fulfilled, the right to enforce the contract does not come into existence."[34] The superior court found that the City did not breach its

---

[32](...continued)
about a basic assumption on which a contract is made may render the contract void if the party claiming mistake satisfies three conditions, one of which is that enforcement of the contract would be unconscionable. *Handle Constr. Co., Inc. v. Norton, Inc.*, 264 P.3d 367, 371 (Alaska 2011) (adopting RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981)). Unconscionability may be found if the circumstances suggest a "vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party." *Askinuk Corp. v. Lower Yukon Sch. Dist.*, 214 P.3d 259, 270 (Alaska 2009) (quoting *OK Lumber Co. v. Alaska R.R. Corp.*, 123 P.3d 1076, 1081 n.17 (Alaska 2005)). The superior court's findings that the Laybourns had the superior bargaining position and that they benefitted from the contract regardless of whether the access road was constructed both preclude a finding of unconscionability in this case.

[33] The Laybourns contend that Giddings's representations to them about the project, if not fraudulent, are nonetheless actionable as constructive fraud or as negligent or innocent misrepresentations. Because we affirm the superior court's finding that there were no misrepresentations or omissions of material fact, we need not address these arguments separately. *See supra* note 25.

[34] *Prichard v. Clay*, 780 P.2d 359, 362 (Alaska 1989) (quoting 5 S. WILLISTON, WILLISTON ON CONTRACTS § 663, at 126-27 (3rd ed. 1961)); *see also Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 129 P.3d 905, 911 (Alaska 2009) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 225(1) (1981))); *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1165 (Alaska 1987) ("[W]hen a party's performance is subject to a condition
(continued...)

agreement with the Laybourns because the "subject to funding" condition was not met.[35]
The Laybourns challenge this finding for clear error; they contend that the City *did* have
funds to pay for the access road but simply chose to spend them elsewhere, and
separately that the City's failure to apply for the wetlands permit in 2004 was also a
breach regardless of the status of funding. But ample evidence in the record supports the
superior court's findings.

First, there is no clear error in the superior court's finding that the City
failed to acquire the necessary funding for the access road. The evidence showed that
the City's usual capital budget could not accommodate a $500,000 project like the Upper
Road extension; that the sports complex itself, financed by bonds, was underfunded by
some $6 million; that the City sales-tax increase related to construction of the complex
was dedicated by ordinance to debt service on the bonds; that the City was dependent on
state and federal funding sources for additional improvements; and that specific requests
to the legislature to fund the Upper Road extension were unavailing.

The Laybourns also contend that the City had enough money available to
construct the access road because it had a "reserve" fund of $378,000 left over from the
sales-tax increase after construction of the sports complex had been fully paid for. The
City admitted that the money in the reserve fund was intended to pay for future capital
improvements to the complex. But not only is that amount still insufficient for
construction of the access road (estimated to cost $500,000), Giddings also testified that

---

[34](...continued)
precedent, that party's duty to perform arises only if the condition is met or is excused.").

[35]     We acknowledge a reading of the easement agreement by which the
obligation to seek funding never came into existence because the City never acquired the
necessary permits. But the superior court treated permitting and funding as parallel, not
sequential, conditions precedent, and the City does not contend this was error.

using the reserve fund would still require approval by the City Council — which voted against funding the road, even to the limited extent of a $50,000 engineering contract to support the City's application for the wetlands permit.

As for the City's failure to apply for the wetlands permit, it is undisputed that the agreement required the City to do so in 2004 and, although it began the process, it ultimately did not complete it. But this failure caused no harm to the Laybourns; regardless of whether the City succeeded in the other steps for permitting and approval, the access road could never be built without funding.

The Laybourns also challenge the superior court's finding that the City did not breach the covenant of good faith and fair dealing because it took "affirmative steps" to satisfy the agreement's funding and permitting conditions. The covenant of good faith and fair dealing is included in all contracts in Alaska.[36] As the superior court noted, "[t]o establish a claim for breach of the covenant . . . , the Laybourns must prove that the City failed to effectuate the reasonable expectations of the parties."[37] "Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing . . . may require . . . refraining from conduct that will prevent or hinder the occurrence of that condition or . . . taking affirmative steps to cause its occurrence."[38] A party asserting a breach of the covenant must prove that the other party failed to act

---

[36]     *Anchorage Chrysler Ctr. v. DaimlerChrysler Motors Corp.*, 221 P.3d 997, 922 (Alaska 2009); *see also Prichard v. Clay*, 780 P.2d 359, 363 (Alaska 1989) (stating that a party's "duty to perform may have matured despite the condition's nonoccurrence if [the party] prevented or hindered its occurrence").

[37]     *See Anchorage Chrysler Ctr.*, 221 P.3d at 992.

[38]     *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 384 (Alaska 2004) (alterations in original) (quoting *Gordon v. Foster, Garner & Williams*, 785 P.2d 1196, 1199 n.6 (Alaska 1990)).

in subjective good faith, "meaning that it cannot act to deprive the other party of the explicit benefits of the contract," or that it failed to act "in objective good faith, which consists of acting in a manner that a reasonable person would regard as fair."[39]

The Laybourns contend that the City's inaction made it unlikely that the "subject to funding" condition would ever be satisfied. They assert that Giddings expanded the project to make it more expensive and complicated; that he waited three years after the agreement was signed before he made his first request for funds from the City Council; that the City selectively chose not to tap the sales tax reserve fund after the sports complex was completed; that the City ignored other possible state, borough, and federal sources of project funds; and that in formulating funding requests to the legislature and the City Council, Giddings never explained to them the importance of the utility easement or how much money the Laybourns saved the City by agreeing to it.

But we see no clear error in the superior court's finding that "[t]he City took affirmative steps to cause the funding and permitting conditions to be satisfied." Lacking sufficient local resources, the City included the capital project in two successive but unsuccessful requests to the legislature. Although the Laybourns' counsel asked Giddings at trial about other sources of federal, state, and borough funding that for one reason or another the City did not pursue, the Laybourns presented no evidence that any of these sources were likely enough to pay off that it would have been reasonable to pursue them. Giddings testified that he carried the wetlands permit application process as far as he could without expert support, then was stymied when the City Council, in the face of public opposition, declined to authorize the engineering contract necessary to complete it. And it was only when City Council and public opposition to the Upper

---

**39** *Id.* (citing *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997)); *see also Anchorage Chrysler Ctr.*, 221 P.3d at 992.

Road extension became evident that Giddings dropped the capital project from the next year's funding request to the state legislature.

The evidence thus shows that the City took reasonable affirmative steps to satisfy the conditions of the easement agreement, and it fails to show that there were other steps the Laybourns reasonably expected. We find no clear error in the superior court's decision that the City did not breach the covenant of good faith and fair dealing.

### C.    The City's Contractual Obligations Were Not Indefinite.

Finally, the Laybourns contend that the City breached the easement agreement by ultimately discontinuing efforts to seek funding; they argue that under the terms of the agreement and the parties' reasonable expectations, the City's obligation to build the access road was and still is "ongoing." Although the superior court did not expressly address this argument, we assume it was implicitly rejected by the superior court's findings that the City discontinued its efforts in 2006 and yet did not breach the agreement or the covenant of good faith and fair dealing.

The agreement states that "[u]pon approval of the public use easement and wetlands permit, the City will construct the access road in 2005, subject to funding." The City's second funding request to the state legislature was in 2006, and that same year Giddings asked the City Council to fund the engineering contract in support of the wetlands permit application; these activities demonstrate the City's own understanding that its reasonable efforts extended past 2005. But the City's obligation was not of an unlimited duration.

As already noted, when the occurrence of a condition precedent "is within the sole control of a single party, most authorities require that party to take 'reasonable'

steps to obtain the occurrence of the condition."[40] Timing may be spelled out in the contract but need not be. "Where no provision is made as to time of performance, a reasonable time is implied."[41] Thus, "[i]f performance must occur within a reasonable time, then conditions precedent, because they impose a duty to perform on obligees, must also occur within a reasonable time."[42] "Ordinarily, what constitutes a reasonable time is a question of fact for the trial court."[43] A reasonable time is "to be determined upon consideration of the subject matter of the contract, what was contemplated at the time the contract was made, and other surrounding circumstances."[44] These rules, taken together, in this case mean that although the City was required to make reasonable efforts to cause the conditions precedent to occur, it could cease its efforts after a reasonable time.[45]

---

[40] *Casey*, 92 P.3d at 385 (citing *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. App. 1984); JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 111(B), at 622-23 (3d ed. 1990)).

[41] *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1089 (Alaska 1985); *see also Castle Props., Inc. v. Wasilla Lake Church of the Nazarene*, 347 P.3d 990, 996 n.24 (Alaska 2014) (quoting *Hall*, 695 P.2d at 1089); *Commercial Recycling Ctr., Ltd. v. Hobbs Indus.*, 228 P.3d 93, 102 n.27 (Alaska 2010) (quoting *Hall*, 695 P.2d at 1089).

[42] *Pearcy v. Envtl. Conservancy of Austin & Cent. Tex., Inc.*, 814 S.W.2d 243, 246 (Tex. App. 1991) (noting that "[t]his rule prevents the enforcement of contingent obligations . . . beyond a period reasonably within the parties' contemplation").

[43] *Hall*, 695 P.2d at 1089.

[44] *Id.*

[45] *See, e.g.*, *Airport Rd. Dev., LLC v. Lithia Real Estate Inc.*, No. CIV. S-08-1458 GGH, 2009 WL 2051099 at *11-13 (E.D. Cal. July 10, 2009) (finding that "a reasonable time is implied . . . for satisfaction of the conditions precedent" in a contract requiring an auto dealer to develop a parcel of land and that the auto dealer acted reasonably when it ceased efforts to satisfy the conditions after the city failed to approve one of them, the buy-back of another parcel).

The agreement was signed in 2003 and referred to activities that the parties expected to be done in 2003, 2004, and 2005. Giddings testified that the inclusion of the year 2005 in the agreement as a target date was not "arbitrary" but rather was intended to reflect the two-year time frame that the City contemplated for projects of this type, accounting for the process of obtaining funding and the limits of political will. The City failed to satisfy the funding and permitting conditions by 2005 but, as noted, continued its efforts into 2006 before Giddings dropped the project in the face of adverse public comment and opposition from the City Council. Based on the superior court's findings, we see no clear error in its implicit rejection of the Laybourns' argument that the City breached either the terms of the agreement or the covenant of good faith and fair dealing when it discontinued its efforts after 2006.

V.   **CONCLUSION**

We AFFIRM the superior court's judgment in favor of the City.[46]

---

[46]   Because we affirm the superior court's judgment, we find it unnecessary to address the City's cross-appeal, arguing that the Laybourns' contract claims were barred by the statute of limitations.