HANDLE CONSTRUCTION COMPANY, INCORPORATED, Appellant,

v.

NORCON, INCORPORATED, Appellee.

No. S–13885.

Supreme Court of Alaska.

Oct. 28, 2011.

Brian J. Stibitz, Reeves Amodio LLC, Anchorage, for Appellant.

Michael C. Geraghty and Stephanie S. Aicher, DeLisio Moran Geraghty & Zobel, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I.  INTRODUCTION

A construction company solicited a bid from a subcontractor to perform concrete work. The construction company provided a plan and bid schedule. The subcontractor responded with a proposal, which the construction company accepted. The subcon-

tractor carried out the subcontract as it understood the terms. After the work was completed, the subcontractor discovered it had inadvertently underbid on the project. In the ensuing lawsuit, the superior court granted partial summary judgment to the construction company with respect to all damages claimed in relation to the bidding error. The subcontractor appeals the partial summary judgment order, claiming breach of an implied warranty that the plans and specifications would be sufficient, and arguing that the superior court erred by applying the theory of unilateral mistake to the case. Because the construction company did not breach the implied warranty and the subcontractor committed a unilateral mistake for which it bore the risk, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Norcon Incorporated, a general contractor, was the prime contractor to Doyon Utilities for construction of a small electrical substation at Fort Greely. On August 13, 2008, Norcon solicited a bid from Handle Construction Company, Incorporated, to perform concrete work for the Fort Greely project. Norcon emailed Handle the bid solicitation from Doyon, as well as drawings (also called a "plan") depicting the foundation work. On August 19, Norcon emailed the bid schedule to Handle's General Manager, Ron Stoops. The bid schedule was attached to the email as a pdf. Stoops assigned the task of estimating the cost of the project to another employee, Jassen Michael, who had not been sent the email or the attachments.

The drawings showed that fifteen L2, one L4, and three L5 foundations should be built, each comprised of two piers that would be paired together to form a single foundation. The body of Norcon's email advised Handle, "[n]ote that they have grouped the L2–1, L2–2, L2–3, L2–4 so that a double p[ie]r foundation is counted as one on the tab. Call with any questions."

Stoops printed the bid schedule, but not the email, and put it on Michael's desk for him to use in preparing Handle's bid. In a later affidavit, Stoops said he "did not have knowledge of the project details and, therefore, didn't understand the significance of the [email] to which the bid schedule was attached."

The bid schedule was set up as a chart, showing the requested items along with a description and quantity for each type of item. Adjacent to each line item were blank fields, in which Handle could write its estimated costs. The bid schedule requested a bid on fifteen L2, one L4, and three L5 foundations. The same day that Norcon sent Handle the bid schedule template and drawings, Handle responded to Norcon with a proposal and completed bid schedule. Norcon awarded the subcontract to Handle.

Work commenced on September 15, 2008. Handle carried out the subcontract in accordance with the drawings. Norcon accepted all of Handle's work.

On October 11, 2008, Handle notified Norcon for the first time that after a trip to the construction site by Handle's General Manager, Handle had "discovered a discrepancy between the . . . bid schedule and the project drawings." It described the discrepancy in a letter as follows:

> The drawings call for 30 type L2 foundations; the bid schedule only calls for 15. The drawings call for 2 type L4 foundations; the bid schedule only calls for 1. The drawings call for 6 type L5 foundations; the bid schedule only calls for 3.

Handle maintained that it had not realized until October 4, 2008, that the word "foundation" in Norcon's bid schedule form was intended by Norcon to mean a two-pier foundation rather than a one-pier foundation. As a result, Handle had miscalculated the value of the project. Handle requested that $123,000 "be added to our proposal in the form of a change order" for the additional foundations, along with costs for "tent and heat" and "room and board," for a total additional cost of $139,648.[1] Norcon did not pay the additional requested amount.

---

1. This figure also included a $552 deduction from a September 10, 2008 modification to the proposal.

## B. Proceedings

On February 6, 2009, Handle filed a complaint alleging that "Handle's compensable costs for performing the work were increased due to discrepancies between the bid schedule and the project drawings which resulted in an error in the calculations on Handle's bid schedule and proposal." Handle sought damages for the bid error and for additional costs allegedly caused by delays that it blamed on Norcon.

On February 23, 2010, Norcon filed a motion for partial summary judgment with respect to all damages claimed by Handle in connection with the discrepancy between the bid schedule and the project drawings. Superior Court Judge Eric A. Aarseth granted partial summary judgment for Norcon, holding that Handle had committed a unilateral mistake, that it bore the risk of the mistake, and that Norcon did not breach the implied covenant of good faith and fair dealing. In April 2010, Handle filed a motion for reconsideration. In a supplemental statement, Handle noted that any other claims were "incidental" to the discrepancy issue, and so "if the Order on Summary Judgment stands, there are no damages left in the case to be tried." The superior court denied Handle's motion. In keeping with Handle's supplemental statement, the court entered final judgment for Norcon on May 6, 2010, ruling that "there were no claims remaining for trial."

Handle appeals.

**2.** *Prentzel v. State, Dep't of Pub. Safety,* 169 P.3d 573, 581 (Alaska 2007) (quoting *In re Estate of Maldonado,* 117 P.3d 720, 722 (Alaska 2005) (internal quotation marks omitted)).

**3.** *K & K Recycling, Inc. v. Alaska Gold Co.,* 80 P.3d 702, 711–12 (Alaska 2003) (citing *Am. Computer Inst. v. State,* 995 P.2d 647, 651 (Alaska 2000)).

**4.** *Prentzel,* 169 P.3d at 581 (citing *Olson v. Teck Cominco Alaska, Inc.,* 144 P.3d 459, 463 (Alaska 2006)).

**5.** *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.,* 880 F.2d 219, 226 (9th Cir.1989). In federal law, this principle is also known as the Spearin doctrine after *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). *Id.*

## III. STANDARD OF REVIEW

■■■ We review grants of summary judgment de novo, determining whether issues of material fact exist and whether the moving party is entitled to judgment as a matter of law.[2] "In particular, a grant of summary judgment based upon contract interpretation is subject to de novo review because interpretation of contract language is a question of law."[3] In reviewing the superior court's decision, we view the facts in the light most favorable to the non-moving party.[4]

## IV. DISCUSSION

### A. Handle's Implied Warranty Of Adequate Specifications Claim Is Waived.

■■■ The implied warranty of adequate specifications is a construction law principle, by which "contractors impliedly warrant the adequacy of the plans and specifications which they supply and require subcontractors to follow."[5] Under this principle, the contractor warrants that the contract is capable of performance. In addition, a project owner impliedly warrants that adhering to the contract terms will result in a satisfactory product.[6] The implied warranty applies specifically to design specifications such as "detailed measurements, tolerances, materials, i.e., elaborate instructions on how to perform the contract."[7] It does not apply to performance specifications.[8] In Alaska, as in other jurisdictions, "[i]f defective specifications cause the contractor to incur extra

**6.** *AAB Joint Venture v. United States.,* 75 Fed.Cl. 414, 428–29 (Fed.Cl.2007). For instance, a contract for installation of a sprinkler system resulting in a high leakage rate in cement joints would be grounds for finding defective specifications. *See id.* at 430 (citing *Appeals of Columbia Eng'g Corp.,* ASBCA No. 32139, 89–2 BCA ¶ 21689, 1989 WL 27594). Another example might be a contract that results in a structurally unsound building.

**7.** *Mega Const. Co. v. United States,* 29 Fed.Cl. 396, 418 (Fed.Cl.1993) (quoting *Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, 860, aff'd, 834 F.2d 1576 (Fed.Cir.1987)).

**8.** *See Stuyvesant Dredging Co.,* 834 F.2d at 1582. *Stuyvesant* explains the distinction as follows: "Design specifications explicitly state how the contract is to be performed and permit no devia-

costs in performing the contract, then the contractor may recover those costs that result from breach of the implied warranty."[9] For instance, in *Northern Corp. v. Chugach Electric Ass'n,*[10] Chugach Electric Association insisted on contractual performance by Northern using a method which proved to be impossible—hauling rock across a frozen lake.[11] We deemed Chugach to have breached the implied warranty that the contract could be performed.[12]

■ Citing to *Chugach,* Handle claims that Norcon's bid schedule was defective and breached an implied warranty that the plans and specifications would be "sufficien[t]." But Handle failed to place the plans in the record, precluding any appellate review of them. For this reason, this argument is waived. We also reject Handle's argument for a second reason: The legal theory of implied warranty is inapposite to this case. There is no dispute that (1) the drawings called for double pier foundations and (2) Handle produced the product they were meant to produce. Handle has never alleged that performance was impossible or that it has incurred unexpected costs due specifically to structural defects inherent in Norcon's requested design. The fact that Handle built the foundations in accordance with the drawings leaves no question that the requested design was feasible and that consequently, the plans and specifications were not defective.

### B. The Superior Court Did Not Err By Applying The Theory Of Unilateral Mistake.

■ Under Section 153 of the Restatement of Contracts, one party's mistake "as to a basic assumption on which he made the contract" may make the contract voidable, but only if that party did not bear the risk of mistake, and "(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake."[13]

As to the first part of this test, Section 154 of the Restatement dictates that a party bears the risk of mistake in three circumstances:

> ... when (a) the risk is allocated to [the mistaken party] by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.[14]

We have adopted the Restatement and often denied relief to parties bearing the risk of mistake.[15]

In his order granting summary judgment, Judge Aarseth held that Handle committed a unilateral mistake, and he allocated the risk to Handle. He explained that Handle bore the risk for this mistake "by not diligently reviewing the materials provided to it by Norcon and by not seeking clarifying instructions." By Handle's own admission, its bid preparer Jassen Michael *never read the contents* of the clarifying email, as Ron Stoops *did not give it to him.* The superior court

---

tions. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results."

9. *State, Dep't of Natural Res. v. Transamerica Premier Ins. Co.,* 856 P.2d 766, 772 (Alaska 1993) (citing *Fairbanks N. Star Borough v. Kandik Constr., Inc. & Assocs.,* 795 P.2d 793, 797 (Alaska 1990), *vacated in part on other grounds,* 823 P.2d 632 (Alaska 1991)).

10. 523 P.2d 1243 (Alaska 1974).

11. *Id.* at 1244.

12. *Id.* at 1247.

13. RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981); *see also Askinuk Corp. v. Lower Yukon Sch. Dist.,* 214 P.3d 259, 270 (Alaska 2009).

14. RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981).

15. *See Kingik v. State, Dep't of Admin., Div. of Retirement & Benefits,* 239 P.3d 1243, 1250 (Alaska 2010); *Dickerson v. Williams,* 956 P.2d 458, 466 (Alaska 1998) ("We have adopted [the Restatement] standards and denied relief to many parties who bore the risk of mistake.").

held that Stoops's "choice not to read the email or not to give Mr. Michael the complete document is an internal issue within Handle." As a result, Handle bore the risk of mistake and the contract was not voidable.

Handle argues that the superior court's analysis under unilateral mistake theory was wrong as a matter of law. Here, Handle appears to have two separate but related legal arguments: first, that unilateral mistake is completely inapplicable to this case, and second, that it did not bear the risk of mistake. As an initial matter, we do not find that the superior court erred in applying the theory of unilateral mistake—the facts of the case easily fit the Restatement definition of unilateral mistake, by which one party (in this case, Handle) makes a mistake "as to a basic assumption on which he made the contract." [16] Handle has presented no convincing arguments otherwise.

As to the allocation of risk, Handle claims that under *Chugach*, the contractor impliedly warrants to the subcontractor that the bid documents are free from defects.[17] From this Handle appears to infer that the subcontractor neither bears the risk of mistake, nor is obliged to seek clarification of bidding specifications. Norcon responds that (1) *Chugach* is inapplicable to this case, as it does not address unilateral mistake theory, and (2) Handle has provided no relevant legal authority for the proposition that the subcontractor does not bear the risk of mistake.

We agree with Norcon. Handle's sole legal authority—*Chugach*—does not support Handle's claim that the subcontractor does not bear the risk of mistake. *Chugach* stands for the proposition that when performance is impossible, the subcontractor should not have to pay for unexpected costs. This is entirely different from saying that a subcontractor should not be allocated the risk of its unilateral mistake.[18]

■ A court has "broad discretion in determining when to deny relief to a mistaken contracting party under the theory that a party bore the risk of the mistake." [19] Here, we find no abuse of discretion. We agree with the superior court that Norcon could "reasonabl[y] rely on the fact that Handle received the information and would process that information as it deemed best"; Norcon bears no responsibility for the flagrant communication missteps between Michael and Stoops that led to the bid error. Our case law also dictates that "the risk of mistake should be borne by the party who has the greater interest in the consequences of a contract term." [20] Here, that party was Handle. For these reasons, it was reasonable for the superior court to allocate the risk to Handle, as per Section 154(c) of the Restatement.

In addition to concluding that the superior court rightfully allocated the risk of mistake under Section 154(c) of the Restatement, we conclude that Handle bore the risk of mistake under Section 154(b). Section 154(b) provides that a party who is "aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient," rightfully bears the risk of mistake. Here, Handle was aware that it completed the bid schedule using incomplete information; by Stoops's own admission he "did not have knowledge of the project details" and "didn't understand the significance of the [email] to which the bid schedule was attached." It is undisputed that Handle's General Manager, Ron Stoops, did not give to Handle's bid preparer, Jassen Michael, a printout of the email; that Michael filled out the bid schedule without the printout; and that Handle submitted the bid schedule without that information. Handle

---

**16.** RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981).

**17.** While not specifically citing to *Chugach* in this section of its appellate brief, Handle refers back to its argument in the preceding section of its brief, that a contractor impliedly warrants the sufficiency of its bid documents. This earlier section cited to *Chugach*.

**18.** *See Tillmon v. Tillmon,* 189 P.3d 1022, 1029 n. 20 (Alaska 2008).

**19.** *Wasser & Winters Co. v. Ritchie Bros. Auctioneers (America), Inc.,* 185 P.3d 73, 79 (Alaska 2008) (quoting 77 AM JUR.3D *Proof of Facts* § 18, at 217 (2004)).

**20.** *Kingik,* 239 P.3d at 1250.

treated its limited knowledge as sufficient, and consequently bore the risk of mistake.

## C. Claims Regarding Norcon's August 19, 2008 Email

■ Handle presents two arguments regarding the August 19, 2008 email that Norcon sent Handle and to which the drawings and bid schedule template were attached. The first is that the superior court implicitly and wrongly held that the subcontract included the contents of the August 19, 2008 email. Handle claims this was reversible error, though it offers no legal authority for this proposition. However, the superior court's order does not indicate that the court incorporated the email into the subcontract. Rather, the superior court queried "whether the text of the email put Handle on notice that its assumption that one foundation equaled one pier [was incorrect]." Rather than incorporate the email into the subcontract, the superior court used the email to interpret the terms of the contract, and specifically the meaning of the word "foundation" as used in the drawings and the bid schedule. Alaska law provides that a court may look to extrinsic evidence without a preliminary finding of ambiguity.[21] In light of this rule, the superior court did not commit an error of law by considering the contents of the body of the email.

■ Handle then argues that the email "did not resolve the ambiguities created by Norcon's defective specifications," and that the superior court erred by finding that the text of Norcon's email put Handle on notice that one foundation equaled two piers. While the email addressed L2 type foundations, Handle argues that it gave "no instruction for how a bidder should treat L4 and L5 type foundations for the purpose of filling out the Bid Schedule." But as discussed above, because Handle failed to introduce the plans and specifications into the record and does not dispute that the drawings called for double pier foundations, it has not established that there were any "ambiguities" created by alleged defects in the specifications, and we

thus need not determine whether they were resolved by the August 19 email.

## D. No Material Fact Disputes Precluded Summary Judgment.

■ Handle claims that Norcon sent its August 19 email to Handle in an untimely fashion, emailing Ron Stoops the bid schedule on 7:52 a.m. of the very day that Handle's proposal was due, thus giving Handle an inadequate opportunity to "digest" and "incorporate" the email into the bid. In addition, Handle notes that Norcon did not communicate directly with Handle's bid preparer, Jassen Michael. Handle argues that the email's timing and the identity of its receiver raise factual questions as to whether the text of the email actually put Handle on notice of Norcon's understanding of the bidding instructions. The superior court imputed knowledge of the email to Michael, opining that the lapse in communication between Stoops and Michael was internal to Handle, and that "[t]here was no duty on the part of Norcon to make sure that Mr. Stoops or Mr. Michael were doing their job." Handle claims this imputation was "not reasonable" given the email's untimeliness and the fact that it was not sent directly to Michael.

■ We disagree that the email was sent so soon before Handle returned its bid that "Handle did not have adequate opportunity to digest the [email] and incorporate it into the bid"; nothing precluded Stoops from printing the email and giving it to Michael or otherwise informing him of its contents. Nor do we conclude that the superior court erred by imputing knowledge of the August 19 email to Handle's bid preparer. Under the Restatement of Agency, "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal."[22] Michael can reasonably have been expected to know the facts material to estimating Handle's bid, the contents of the email included.

**21.** *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 771 n. 1 (Alaska 1982).

**22.** RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006).

### E. Norcon Was Not Obligated To Inquire Into Handle's Bid, Which Was 35% Below The Next–Lowest Bidder.

Handle argues that even if the superior court was correct in finding that Handle committed a unilateral mistake, Norcon should have inquired as to whether Handle was under a mistaken assumption when it submitted its bid because its bid was 35% lower than that of the next-lowest bidder. Handle argues that an offeree may not take an offer "too good to be true," and that the 35% difference was great enough that it should have placed Norcon on notice that Handle believed the terms of the contract were different from Norcon's requested specifications. While there are circumstances when this theory is viable, we reject it here for two reasons.

First, Handle's argument is based on Section 153 of the Restatement of Contracts, which states that a contract may be voidable by a party committing a unilateral mistake if "the other party had reason to know of the mistake or his fault caused the mistake." [23] But the same Restatement section makes clear that this doctrine does not apply if the party committing the mistake bore the risk of mistake. As discussed above, Handle rightfully bore the risk of mistake under the facts of this case, given its failure to open the email containing specifications and forward it to its bid preparer. Under these circumstances, Handle is not entitled to claim that Norcon had any duty to inquire.

Second, Handle has made no showing that, even if the defense were applicable, a 35% difference in bid amounts was enough to put Norcon on a duty to inquire. Handle cites only two cases in support of its argument, but neither lends any appreciable support. Notably, both cases found no duty to inquire. In *Wender Presses, Inc. v. United States*,[24] the Court of Claims rejected the argument that the government had a duty to inquire where a bid was *125%* higher than the next highest bid. If a 125% difference was insufficient to create a duty to inquire, the 35% difference in this case was clearly not enough. *Bauer v. American International Adjustment Co.*,[25] also cited by Handle, is even less helpful to Handle's case. In *Bauer*, purporting to believe that an offer had previously been made to a claimant, an insurance adjuster characterized it as "extremely generous" and "an amount which I never would have considered offering on this case" but stated that she would leave the offer open for 30 days.[26] (The parties agreed that the offer had not previously been made.)[27] Then, after trying to convince the insurance company to increase its offer slightly, the claimant accepted the offer.[28] The insurance company claimed that, by seeking to increase the settlement amount, the claimant had rejected its offer and made a counteroffer.[29] The lower court allowed rescission of the agreement that was reached when the claimant subsequently accepted the offer on the grounds that the claimant's attorney had a duty to inquire about the agent's allegedly erroneous original offer.[30] The appellate court reversed, holding that there was no duty on the part of the claimant to inquire about the insurance agent's purported mistake.[31] In short, *Bauer* has little to do with our case.[32]

**23.** Restatement (Second) of Contracts § 153 (1981).

**24.** 170 Ct.Cl. 483, 343 F.2d 961 (1965).

**25.** 389 N.W.2d 765 (Minn.App.1986).

**26.** *Id.* at 766.

**27.** *Id.* at 767.

**28.** *Id.*

**29.** *Id.* at 768.

**30.** *Id.* at 767.

**31.** *Id.* at 768.

**32.** *Bauer* cited to *Speckel v. Perkins*, 364 N.W.2d 890 (Minn.App.1985), a case involving a letter containing a settlement offer that was patently erroneous (in that the letter contained diametrically contradictory statements in successive paragraphs) and contained an offer over three times as large as was intended. Because the letter containing the mistaken offer was "internally inconsistent," the court held that "[t]he letter containing the disputed settlement amount raised a presumption of error and a consequent duty to inquire." 364 N.W.2d at 893–94. Thus, while *Speckel* is closer than *Bauer* to the factual situation in our case, it lends no support to Handle's

Thus, neither of the cases cited by Handle leads us to conclude that the 35% difference between Handle's bid and the next highest bid created a duty on the part of Norcon to inquire before entering into the subcontract.

## V. CONCLUSION

Because Handle waived its argument that the plans were defective, and because the superior court did not err in applying unilateral mistake and allocating the risk of mistake to Handle, we AFFIRM the superior court's grant of partial summary judgment for Norcon.

position because there was no patent internal inconsistency in the bid and no other marker of unreliability.