**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ADAM A., | ) | |
| | ) | Supreme Court No. S-19373 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-23-08058 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| JOCELYN A., | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2129 – January 14, 2026 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Adam A., pro se, Anchorage, Appellant. Notice of nonparticipation filed by Maurice N. Ellis, The Law Office of Maurice N. Ellis, Anchorage, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I. INTRODUCTION

In this appeal a father of two children challenges various orders entered by the superior court concerning the interpretation and enforcement of a custody settlement agreement. The agreement provided that the father would complete a state-approved domestic violence intervention program (DVIP). The superior court found that the father failed to complete such a program and limited him to supervised

---

\* Entered under Alaska Appellate Rule 214.

visitation with the children until he did so. The court also denied the father's motion alleging that the mother had willfully violated the terms of the custody agreement. Deeming the father's motion frivolous and vexatious, the court ordered him to pay the attorney's fees the mother incurred in responding to the motion. Seeing no reversible error in any of these rulings, we affirm the superior court's orders.

## II.    FACTS AND PROCEEDINGS

### A.    The Divorce And Custody Settlement Agreement

Adam and Jocelyn A. were married in 2016 and have two young children.[1] They separated in 2023. Adam remained in Alaska, and Jocelyn relocated to New Mexico with the children.

In June 2024 Adam and Jocelyn reached a court-approved divorce and custody settlement agreement. The agreement contains a six-year civil no-contact order, gives Jocelyn primary physical custody and sole legal custody of the children, and sets out a visitation schedule. The agreement provides that "Adam is willing to complete the State of Alaska approved twenty-four (24) session Domestic Violence Intervention Program" and requires him to "immediately inform Jocelyn and the court" if he "fails to complete the course for any reason." The agreement also provides for a transition to joint legal custody following Adam's attendance and completion of a 24-session state-approved DVIP.

### B.    Dispute Over Visitation

In early December 2024 Adam moved the superior court to enforce the agreement's visitation schedule. He asserted that Jocelyn would not allow his winter break visitation with the children unless he completed the DVIP as described in the agreement. In response, Jocelyn moved to suspend Adam's in-person visitation until he completed the DVIP.

---

[1]    To protect the family's privacy, our decision uses their first names and initials.

The superior court granted Adam's motion to enforce visitation over winter break. But it ordered Adam to file proof of completion of the DVIP before resuming in-person visitation after the winter break visit.

## C.     Winter Break Custody Exchange

The 2024 winter break custody exchange spurred additional conflict between the parties. According to the terms of the agreement, Adam was to travel to New Mexico to meet the children and accompany them back to Alaska for the holiday break.

Early on the morning the custody exchange was to take place, Adam messaged Jocelyn to inform her that his ex-wife Ashley would receive the children and travel with them to Anchorage. Adam sent Jocelyn a copy of a letter granting Ashley permission to accompany the children, along with flight information for only Ashley and the children.

Jocelyn responded, telling Adam that she would not let the children go to Alaska unless he was present to receive them. When Adam did not promptly reply, Jocelyn drove the children back to her home. Later, without having told Jocelyn that he was actually present at the airport with Ashley, Adam called local police to report that Jocelyn had not delivered the children as required by their custody agreement. The police showed up at Jocelyn's home. Later in the day, the children traveled back to Alaska with Adam.

## D.     Motion For Order To Show Cause

After the winter visit Adam filed a motion for Jocelyn to show cause why she should not be held in contempt for violating the custody agreement and the order enforcing the winter break visitation. Jocelyn opposed.

The court denied the motion. The court recognized that the custody agreement was not clear on whether third parties could facilitate a custody exchange with a parent's permission. The court ruled that such third-party custody exchanges were permissible so long as reasonable notice was given. But the court described

Adam's conduct during the custody exchange as "pointless gamesmanship" that was "not in the children's best interest." It noted that Adam had misled Jocelyn into believing that he was not present in New Mexico for the custody exchange and that his calling the police on Jocelyn was "an unnecessary escalation of conflict." Accordingly, the court determined that Adam's motion to show cause was frivolous and his conduct was vexatious. It ordered Adam to pay Jocelyn's attorney's fees for responding to his motion.

**E.     Order On Compliance With DVIP Requirement**

Adam filed a series of documents as proof that he completed numerous domestic violence-related courses, which he asserted should satisfy the DVIP requirement in the agreement. Jocelyn argued that most of these courses were completed prior to reaching the agreement and, in any event, did not conform to the agreement's DVIP requirement. Adam argued that going to counseling and completing these courses was like healing a broken arm, and requiring "that [his] arm be re-casted, [and] that the cast be applied by a different doctor" through a state-approved DVIP was unnecessary and illogical.

The superior court found that Adam knew, when he affirmed the agreement in court, that there was no locally available DVIP that could be completed in 24 weeks; the only program offered was 36 weeks. Declining to "reward [Adam's] tactical omissions," the court ruled that he must complete the program that was available, even though it would take 36 weeks. The court rejected Adam's assertion that the programming he had completed satisfied this requirement. Therefore, it ruled that Adam would have only supervised visitation with the children until he filed proof of enrollment in a state-approved DVIP and proof that he had completed at least half of the programming.

Adam appeals.

## III. DISCUSSION

### A. The Court Did Not Err By Denying Adam's Motion To Show Cause.

Adam appeals the superior court's order denying his motion to order Jocelyn to show cause for her alleged failure to comply with the winter break provisions of their custody agreement. The court did not err in denying this motion because the motion did not make a sufficient showing that Jocelyn willfully violated the agreement.

Under Civil Rule 90(b), "upon a proper showing on ex parte motion supported by affidavits," the court shall "order the accused party to show cause" why they "should not be punished for the alleged contempt." The relevant question in this appeal is whether Adam made a "proper showing" of contempt such that the superior court should have ordered Jocelyn to show cause. "[W]hether Rule 90(b) mandates a show-cause order upon a 'proper showing' and whether the moving party has made out a prima facie showing of contempt are legal questions" that we review de novo, applying our independent judgment.[2]

A party may be held in contempt if the movant makes the following showing:

> (1) the existence of a valid order directing the alleged contemnor to do or refrain from doing something and the court's jurisdiction to enter that order; (2) the contemnor's notice of the order within sufficient time to comply with it; and in most cases, (3) the contemnor's ability to comply with the order; and (4) the contemnor's wilful failure to comply with the order.[3]

The superior court determined, based on the parties' pleadings and affidavits, that Adam failed to make a prima facie showing that Jocelyn willfully violated the agreement.

---

[2] *Johnson v. Johnson*, 239 P.3d 393, 406 (Alaska 2010) (citing *Universal Motors, Inc. v. Waldock*, 719 P.2d 254, 259 (Alaska 1986) (holding that whether party presented evidence sufficient to establish prima facie case is question of law)).

[3] *Hartland v. Hartland*, 777 P.2d 636, 647 (Alaska 1989).

Instead, the court determined that Adam engaged in "misleading communication," "pointless gamesmanship," and "unnecessary escalation of conflict."

We agree with the superior court's review of the record. Adam messaged Jocelyn only two hours before the planned custody exchange (in the early hours of the morning), stating that Ashley would receive the children.[4] The letter he attached, which gave Ashley permission to "escort [the children] through the airport and fly with them to Anchorage Alaska and [provide] all associated care needs during that time," implied that Adam was not present. This implication was reinforced by Adam sending Jocelyn flight information for Ashley and the children but not for him. When Jocelyn indicated that she would not deliver the children to Ashley alone, Adam did not promptly respond. Rather than simply inform Jocelyn that he was also at the airport in New Mexico, Adam called the police. The record on which Adam's motion for order to show cause was based shows only that he attempted a poorly conceived ruse to entrap his ex-wife; not that Jocelyn willfully violated the custody agreement.

Adam correctly points out that the custody agreement was silent on whether custody exchanges could be facilitated by third parties designated by either parent. Therefore, Jocelyn's refusal to deliver the children to Ashley at the airport that morning may have been a technical violation of the custody agreement. But according to Jocelyn's affidavit, after attempting to consult her attorney, who was not available at that early hour, she made a decision not to exchange the children when Adam did not respond to her messages. She exchanged the children later in the day, after consulting counsel. Given the custody agreement's lack of clarity about third-party custody exchanges, and Jocelyn's undisputed factual assertions, there is nothing in the record

---

⁴ Adam takes issue with the court's statement that he gave Jocelyn only a few minutes' notice, when he notified her two hours before the planned exchange. Although Adam's factual assertion is accurate, it does not make his conduct seem any more reasonable.

establishing that Jocelyn willfully violated the custody agreement. Because Adam failed to make a "proper showing" of contempt, the superior court did not err by denying his motion without ordering Jocelyn to show cause.[5]

B.   **The Order Awarding Attorney's Fees To Jocelyn Due To Adam's Vexatious Conduct Was Not Legal Error Or An Abuse Of Discretion.**

The superior court determined that Adam's conduct during the custody exchange was "pointless gamesmanship not in the children's best interest," that his calling the police on Jocelyn rather than informing her that he was present in New Mexico was an "unnecessary escalation of conflict," and that his motion for an order to show cause was "frivolous." It ordered Adam to pay Jocelyn's reasonable attorney's fees incurred responding to his motion. Adam appeals this ruling, but we affirm because we see no legal error or abuse of discretion.

"In an action to modify, vacate, or enforce that part of an order providing for custody of a child or visitation with a child, the court may, upon request of a party, award attorney fees and costs of the action."[6] When awarding fees, "the court shall consider the relative financial resources of the parties and whether the parties have acted in good faith."[7] "[N]either factor necessarily takes precedence over the other."[8]

The superior court's rulings that Adam's conduct was gamesmanship and that his motion was frivolous are well supported by the record for the reasons discussed above. And Adam has not argued that the superior court's failure to make an explicit

---

[5]   For this same reason, Adam's assertion that the court erred by not holding a hearing on the motion to show cause fails as well.

[6]   AS 25.20.115.

[7]   *Id.*; *see also Collier v. Harris*, 377 P.3d 15, 25 (Alaska 2016) (holding that under AS 25.20.115 "the superior court [is] now required to consider both bad faith and the parties' relative financial circumstances").

[8]   *Collier*, 377 P.3d at 25 (citing *S.L. v. J.H.*, 883 P.2d 984, 985-86 (Alaska 1994)).

finding on the parties' relative financial resources requires reversal. Therefore, we affirm the superior court's attorney's fee order.

### C. The Superior Court Did Not Err By Conditioning Unsupervised Visitation On Adam's Completion Of A State-Approved DVIP.

On appeal Adam challenges the order limiting him to supervised visitation until he files proof of enrollment in and completion of half of a state-approved DVIP. He argues that the court erred by (1) conditioning his visitation on completion of a state-approved DVIP and (2) finding that he had not completed such a program.[9] But we see no error in the superior court's rulings. In light of the agreement's text, the statutory function of a DVIP, and the course of negotiations, the agreement is most plausibly interpreted to make Adam's continued right to unsupervised visitation dependent on his enrollment in and completion of a state-approved DVIP. And the court did not clearly err by finding that the programming Adam completed was not such a program.

Adam argues that his visitation rights were not contingent on enrolling in a DVIP. He concedes that he agreed to complete a state-approved DVIP as part of the agreement. But he notes that completion of the DVIP was expressly tied to legal custody and argues that it was not a requirement of visitation. Therefore, he argues, it was error for the court to limit him to supervised visitation until he completed a state-approved DVIP.

---

[9] Adam points out that the order the superior court entered before the holiday custody exchange required him to prove "completion of a 24-week domestic violence intervention program," and he argues that the lack of reference to a "state-approved" program indicates that he was not required to complete a state-approved DVIP. This argument is not convincing. The superior court simply appears to have paraphrased the language of the agreement when entering this order; there is no indication of an intent to substantively alter the agreement's terms or to relieve Adam of the obligation to complete a "state-approved" DVIP.

Adam's argument requires us to interpret the custody agreement. "We construe settlement agreements in dissolutions using traditional contract principles."[10] "In interpreting any contract, '[t]he goal . . . is to give effect to the reasonable expectations of the parties.' "[11] We do so by looking to the language of the contract and to extrinsic evidence of the parties' intent, if any, at the time the contract was made.[12] Extrinsic evidence can include "the parties' negotiations, and the structure of the [a]greement."[13] Contract interpretation typically presents a question of law, even when extrinsic evidence is considered.[14] Therefore, we interpret the agreement using our independent judgment.[15]

The custody agreement states that "Jocelyn shall initially be awarded sole legal custody of the children with the provision that if Adam attends and completes the 24 session Alaska State Approved [DVIP] and files proof of completion with the court, they shall transition to joint legal custody." In emphasizing the tie between the DVIP and legal custody, Adam's brief seems to suggest that completing the DVIP was therefore effectively optional — a step that was required only if he wished to regain

---

**10** *Fredrickson v. Hackett*, 407 P.3d 480, 483 (Alaska 2017) (quoting *Martin v. Martin*, 303 P.3d 421, 429 (Alaska 2013)).

**11** *Cook v. Cook*, 249 P.3d 1070, 1078 (Alaska 2011) (alteration in original) (quoting *Knutson v. Knutson*, 973 P.2d 596, 600 (Alaska 1999)).

**12** *Id.*

**13** *Laybourn v. City of Wasilla*, 362 P.3d 447, 454 (Alaska 2015) (alteration in original).

**14** *Cooper Leasing, LLC v. Woronzof Condo. Ass'n*, 548 P.3d 636, 645 (Alaska 2024). Contract interpretation "becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning." *Id.* As explained below, the extrinsic evidence supports only one interpretation of the contract. Therefore, the interpretation of the contract is a question of law to which we apply our independent judgment.

**15** *Id.*

legal custody of the children. Accordingly, Adam maintains, completing the DVIP was not a condition of continued unsupervised visitation with the children.

But this interpretation is in tension with another DVIP provision in the agreement: "Upon completion of the program, Adam shall file proof of completion with the court. Should Adam fail to complete the program for any reason, he shall immediately inform Jocelyn and the court." If Adam's completion of the DVIP were tied solely to legal custody, and had no further legal consequence, then this provision would be superfluous. That is, there would be no reason to require Adam to inform the court immediately of failure to complete the DVIP if that failure carried no consequence.

Therefore, the language of the agreement indicates that the parties did intend Adam's failure to complete a DVIP to have some effect.[16] That effect is not stated expressly in the agreement, but it is apparent from the nature of the parties' negotiations and the role a DVIP plays in the custody statute.[17]

A state-approved DVIP has a special function in statute. When a court finds that a parent has a history of perpetrating domestic violence, the court may allow that parent only supervised visitation "conditioned on that parent's participating in and successfully completing an intervention program for batterers."[18]

---

[16] *Baker v. Ryan Air, Inc.*, 345 P.3d 101, 112 n.32 (Alaska 2015) (citing RESTATEMENT (SECOND) OF CONTRACTS § 203 cmt. b (A.L.I. 1981) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.")); *see also Alaska State Hous. Auth. v. Sipary*, 668 P.2d 824, 827 (Alaska 1983) ("Effect should be given, where possible, to every part of a contract.").

[17] *Cf. Young v. Kelly*, 334 P.3d 153, 157 (Alaska 2014) ("Courts will fill in gaps where parties' reasonable expectations are clear, but they cannot impose performance where it is not clear the parties had a meeting of the minds.").

[18] AS 25.24.150(j). *See also Limeres v. Limeres*, 320 P.3d 291, 299 (Alaska 2014) (explaining that "if the court finds that a parent has a history of perpetrating domestic violence, a rebuttable presumption arises against granting that parent custody or unsupervised visitation").

Given the way the parties' litigation unfolded, Adam's obligation to complete a "state-approved DVIP" was likely intended to mirror the DVIP's statutory function. Jocelyn had alleged that Adam had committed acts of domestic violence against her. Had the court held a hearing and found Jocelyn's allegations credible, the court would have been obligated to limit Adam to supervised visitation until he completed a state-approved DVIP. By reaching an agreement without a hearing, each party benefitted. Jocelyn benefited because Adam was required to complete a state-approved DVIP — not just any domestic violence classes or programming.[19] Adam benefitted by retaining unsupervised visitation and avoiding the risk of the court finding he had committed acts of domestic violence, which could have carried collateral consequences for him.[20] Therefore, the most reasonable reading of the agreement is that Adam's obligation to complete a DVIP played the same role that the DVIP provision plays in statute. That is, Adam's right to continued unsupervised visitation under the custody agreement depended on his enrollment in and completion of a state-approved DVIP. The superior court's order limiting Adam's visitation until he filed

---

[19] *See* AS 12.55.101(a)(1) (providing that upon conviction for crime of domestic violence, defendant may be required "to participate in and complete . . . one or more programs for the rehabilitation of perpetrators of domestic violence that meet the standards set by, and that are approved by, the Department of Corrections under AS 44.28.020(b)"); AS 44.28.020(b) (providing Department of Corrections shall adopt standards for rehabilitation programs for perpetrators of domestic violence); *Cooper v. Dist. Ct.*, 133 P.3d 692, 706 (Alaska App. 2006) (describing such program as "batterer's intervention program").

[20] For example, the record indicates that Adam is in the military, and the entry of a long-term DVPO against him could have triggered the federal statute barring possession of firearms by a person subject to a protective order meeting certain criteria. *See Eng v. Alaska Dept. of Public Safety*, 557 P.3d 1198 (Alaska 2025) (citing 18 U.S.C. § 922(g)(8)).

proof that he had completed half of a state-approved DVIP merely enforced the intent of the custody agreement.[21]

Adam's second argument — that the court erred in ruling that he had not in fact complied with the agreement — is also unavailing. The superior court did not clearly err in finding that he failed to complete the required DVIP.

The agreement required Adam to complete a "24 session Alaska State Approved Domestic Violence Intervention Program (DVIP)." But the only locally available state-approved DVIPs require completion of at least 36 hour-long sessions. Asserting that it was not possible to comply with the precise terms of the agreement, Adam argued to the superior court that the steps he had taken — a 16-hour "Course for Violence" (not state-approved), a military family advocacy course, occasionally meeting with a family advocacy social worker, a 2-hour anger management course, and individual counseling — satisfied the agreement.

The superior court disagreed. It observed that Adam's own text messages showed that he learned, shortly after signing the agreement but before he affirmed the agreement in court, that the locally available state-approved DVIP required more than 24 sessions. Although the agreement provided that Adam was to inform the court and parties if he could not complete the DVIP "for any reason," he did not bring the discrepancy to Jocelyn's or the court's attention. Therefore, the court reasoned, it would not reward Adam's "tactical omissions" and would instead interpret the agreement to require completion of a state-approved DVIP, even if the locally available program required 36 sessions rather than 24.

---

[21]    For this reason, we do not view the superior court's order limiting Adam to supervised visitation as a modification of visitation, which would have required the court to find there was a substantial change of circumstances affecting the children's best interests. *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016).

Although the superior court did not articulate a legal framework for its reasoning, its analysis echoes the doctrine of mistake in contract law.[22] The DVIP provision was based on the mistaken assumption that the locally available state-approved DVIP could be completed in 24 sessions. A party to a contract based on a mistake cannot avoid the contract if he bears the risk of the mistake.[23] A party bears the risk of mistake when the risk is allocated to him by the parties' agreement; when he knows he has limited knowledge of the facts underlying the mistake but treats his limited knowledge as sufficient when the contract is formed; or when the court allocates risk "on the ground that it is reasonable in the circumstances to do so."[24] We have also held that "the risk of mistake should be borne by the party who has the greater interest in the consequences of a contract term."[25]

The superior court required Adam to bear the consequence of the mistake by obliging him to complete the state-approved DVIP, even though doing so required attending 36 sessions. This was proper. Adam was aware that the locally available state-approved DVIP required a minimum of 36 sessions when he affirmed the

---

[22] *See* RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (A.L.I. 1981) (providing that erroneous belief as to contents or effect of writing expressing agreement is mistake).

[23] Unless a contracting party bears the risk of mistake, a party to a contract may avoid the contract when a mistake relating to a basic assumption on which the contract was formed has a material and adverse effect on the party. The effect of the mistake must make enforcement unconscionable, or the other party must have had reason to know of the mistake or caused it. *Id.* at § 153; *see also Handle Const. Co. v. Norcon, Inc.*, 264 P.3d 367, 371 (Alaska 2011) ("We have adopted the Restatement and often denied relief to parties bearing the risk of mistake.").

[24] RESTATEMENT (SECOND) OF CONTRACTS § 154 cmt. c (A.L.I. 1981); *Handle Const. Co.*, 264 P.3d at 371.

[25] *Handle Const. Co.*, 264 P.3d at 372 (quoting *Kingik v. State, Dep't of Admin., Div. of Retirement & Benefits*, 239 P.3d 1243, 1250 (Alaska 2010)).

agreement requiring him to complete a state-approved DVIP in 24 sessions. And he certainly had a greater interest in the consequences of the agreement's DVIP provision than Jocelyn because he was the one required to fulfill the term's requirements. Therefore, we see no error in the superior court's ruling that Adam must fulfill the terms of the agreement that are possible to accomplish: i.e., to complete a state-approved DVIP, however many sessions it takes.

Nor do we see any error in the court's conclusion that Adam failed to show that he fulfilled that obligation. He presented proof that he completed a 12-week family advocacy course, a 2-hour anger management course, a 16-hour online "Course for Violence" (not state-approved), met with a family advocacy social worker, and had been in individual therapy for roughly a year. None of these steps, singly or in combination, amounts to completion of the state-approved DVIP to which the parties had agreed.

We also reject Adam's argument that our case law establishes that the programming he did complete is a sufficient substitute for the state-approved DVIP obligation to which he agreed. Adam cites *Cooper v. Cooper* in support of this argument.[26] But *Cooper v. Cooper* mainly concerns whether a DVPO is violated by a respondent being in the same public place as the protected person; it does not discuss counseling or DVIPs.[27] Adam is more likely referring to the Court of Appeals' decision in *Cooper v. District Court*, which he cited in his motion work before the superior court.[28] *Cooper v. District Court* arose from a dispute over whether a man who was convicted of assaulting his wife was properly sentenced to attend counseling, or whether he should have been sentenced to attend a state-approved DVIP, as required by statute.[29]

---

[26]     144 P.3d 451 (Alaska 2006).

[27]     *Id.* at 453.

[28]     133 P.3d 692, 694 (Alaska App. 2006).

[29]     *Id.*

But the court of appeals did not consider whether the counseling would satisfy the legal requirement for a DVIP.[30] It ruled instead that the victim and the Office of Victim's Rights lacked standing to challenge the sentence.[31] So this case does not support Adam's argument either.

Finally, we note that in *Stephanie F. v. George C.* we held that a parent may rebut the statutory presumption against custody due to domestic violence through means other than a state-approved DVIP.[32] But the case is not on point because Adam *expressly agreed* to complete a state-approved DVIP. And unlike the parent in *Stephanie F.*, who presented expert testimony that the state-approved DVIP would be "contraindicated" for him and "could be more detrimental than productive,"[33] Adam has presented no evidence that a state-approved DVIP is inappropriate for him. Accordingly, we see no error in the superior court's ruling that the programming Adam completed was not a sufficient substitute for a state-approved DVIP.

## IV. CONCLUSION

The superior court's orders are AFFIRMED.

---

[30] *Id.* at 695.

[31] *Id.*

[32] 270 P.3d 737, 753 (Alaska 2012).

[33] *Id.*